**Exhibit 1**



November 2, 2012

*Via ECF*

Hon. Magistrate Judge Michael A. Hammer
Martin Luther King, Jr. Federal Building & U.S. Courthouse
U.S. District Court of New Jersey
50 Walnut Street, Courtroom 3C
Newark, NJ 07101

    Re:  *Castro, et al. v. Sanofi Pasteur Inc.*, 2:11-cv-07178 (JLL) (MAH)

Dear Magistrate Judge Hammer:

   Plaintiffs Adriana M. Castro, M.D., P.A., Sugartown Pediatrics, LLC, and Marquez and Bengochea, M.D., P.A. ("Plaintiffs"), and defendant Sanofi Pasteur Inc. ("Sanofi") submit this joint discovery letter, pursuant to the Court's Pretrial Scheduling Order (Doc. No. 104) and Local Civil Rule 37.1.

   For nearly two months, the parties have been engaged in extensive efforts to narrow or eliminate discovery disputes, including exchanging numerous lengthy letters and emails, and conducting telephonic conferences on September 7 and September 27. While these efforts were successful in eliminating, narrowing, or deferring many disputes, the parties request the Court's guidance in resolving the following five issues.[1]

## Brief Overview of the Issues in Dispute

**Plaintiffs' Overview:**

   Sanofi's arguments suffer from two fundamental flaws. *First*, Sanofi tries to impose a double-standard as follows: (1) by seeking discovery from Plaintiffs and various third parties

---

[1] The documents attached as exhibits are: Ex. 1 (Aug. 22 Ltr. from Walker to Kass); Ex. 2 (Aug 28 Ltr. from Kass to Walker); Ex. 3 (Sept. 6 Ltr. from Walker to Kass); Ex. 4 (Sept. 12 Ltr. from Walker to Kass); Ex. 5 (Sept. 18 Ltr. from Kass to Walker); Ex. 6 (Sept. 21 Ltr. from Walker to Kass); Ex. 7 (Sept. 24 email from Kass to Walker); Ex. 8 (Sept. 27 email from Walker to Kass); Ex. 9 (Oct. 1 Ltr. from Kass to Walker); Ex. 10 (Oct. 17 Ltr. from Kass to Walker); Ex. 11 (Pls' Obj. and Resp. to Sanofi's First RFPs); Ex. 12 (Sanofi's Obj. and Resp. to Pls.' Third RFPs); Ex. 13 (Sanofi subpoena to Novartis); Ex. 14 (Oct. 3 email memorializing Novartis subpoena agreement); Ex. 15 (Sept. 20 Ltr. from Kass to GSK, at 2); Ex. 16 (L. McDonald Declaration); Ex. 17 (R. Auth Declaration); Ex. 18 (Chiron Corp. 2005 10K); Ex. 19 (Sanofi's First RFAs); Ex. 20 (Sanofi's First Interrogatories).

**Proskauer»**

going back to 2004 or 2005, but then refusing to produce information from before 2008; (2) by asking for communications between Plaintiffs' counsel and third parties, while refusing to produce the same types of communications from defense counsel; and (3) by proposing that Plaintiffs be required to produce or log communications with their consulting witnesses, yet refusing to provide similar disclosures or even a similar log. *Second*, Sanofi refuses to abide by settled legal doctrine: (1) by refusing to produce any hard copies of relevant discovery at its own cost, despite the fact that courts for decades have required such productions of parties without cost-shifting; and (2) by seeking information about Plaintiffs' profitability, although courts, including Judge Linares in this Court, have nearly universally recognized such discovery is irrelevant when direct purchaser plaintiffs in an antitrust case seek overcharge damages, not lost profits. Sanofi should not be permitted to impose a double-standard or to receive a special exemption from the ordinary discovery rules.

**Sanofi's Overview:**

The issues before the Court may be boiled down fairly simply: Plaintiffs refuse to comply with critical, and relatively low-burden, discovery requests, while seeking to impose costly and burdensome discovery obligations on Sanofi for irrelevant purposes. To review plaintiffs' summary and arguments in the pages that follow, one could hardly tell that Sanofi is the party who has produced over a million pages of documents on an expedited schedule consistent with the Court's scheduling order, while plaintiffs have produced the equivalent of two boxes. Sanofi has complied with every ***reasonable*** request of plaintiffs and then some; it has drawn the line only when plaintiffs' requests and arguments have crossed over from plausibly reasonable to vexatious.

There are five issues that require the court's attention, three involving requests from plaintiffs for additional discovery, and two requests by Sanofi for additional discovery. Granting plaintiffs' requests while denying Sanofi's would only exacerbate the disproportionate burdens Sanofi has already incurred. More importantly, settled law supports Sanofi's requests for reasonable limits on discovery as to itself, and reasonable compliance as to plaintiffs. Accordingly, Sanofi requests that this Court:

- Deny plaintiffs' request to double the temporal scope of discovery from 2004 to 2008, because the alleged anticompetitive act began in ***2010***;

- Require plaintiffs to pay a portion of Sanofi's discovery costs in connection with the production of hard-copy documents, because Sanofi has submitted evidence proving that the burden of production likely outweighs the benefits to plaintiffs;

- Deny plaintiffs' request to breach Sanofi's privilege claims over communications between counsel and potential third-party fact witnesses, because plaintiffs have established no substantial need for such information;

2

**Proskauer**

- Order plaintiffs to produce (or log) pre-Complaint communications between plaintiffs and Navigant Consulting, because Navigant is a fact (not expert) witness with regard to some of the issues in this case; and

- Order plaintiffs to produce documents concerning the impact of vaccine costs on the named plaintiffs' revenues, cash flows, and profitability, because plaintiffs have alleged as much as part of their injury and damages case.

## Disputed Issues

### 1.    *Relevant Time Period for Plaintiffs' RFPs*

The parties dispute the proper time period to apply to Plaintiffs' requests for production of documents. Plaintiffs believe that January 1, 2004 to the present is the appropriate time period. Sanofi believes that January 1, 2008 to the present is the appropriate time period. This issue has been the subject of extensive discussion in multiple letters between counsel for the parties, and was discussed during both meet-and-confer teleconferences, but the parties remain at an impasse on this issue.

**Plaintiffs' Position:**

Despite Plaintiffs' offer to shorten the beginning of the relevant discovery time period from January 1, 1998, to January 1, 2004, to address Sanofi's burden objection, *see* Ex. 1, at 3, Sanofi nevertheless continues to object, stating that it was willing only to search for and produce documents going back to January 1, 2008. Sanofi now says it believes 2008 is the time limitation that should apply to documents relevant to both Plaintiffs' claims and Sanofi's Counterclaim, *see* Ex. 2, at 3-4. Sanofi's proposed limitation should be rejected. It not only is inconsistent with Sanofi's own relevant time period in discovery it has served on Plaintiffs and various third parties in this case, but it would almost certainly exclude substantial evidence important both to Plaintiffs' prosecution of its claims and its defense of Sanofi's Counterclaim.

As contextual background, Sanofi's intent and efforts to maintain or enhance monopoly power in numerous pediatric vaccine markets, including the meningococcal vaccine market, extend back well before Sanofi's proposed 2008 discovery cut-off date. As Plaintiffs allege in the First Consolidated Amended Class Action Complaint ("Complaint"), Sanofi began its anticompetitive bundling scheme in or before 2005, when it began imposing penalties on customers who purchased products from its competitors. Compl. ¶ 106. Sanofi's bundling scheme, by its very nature, involves the linking of products across multiple pediatric vaccine markets. Sanofi uses its web of multiple bundling contracts to drive customers away from its competitors, and thereby to maintain or gain monopoly power in numerous pediatric vaccine markets. Sanofi's bundling contracts achieve their exclusionary effect by imposing penalty prices on all of Sanofi's products if a purchaser buys vaccines from Sanofi's competitors. As Judge Linares found in denying Sanofi's motion to dismiss, "Plaintiffs allege that Sanofi used its market power ***across all relevant markets*** to impose bundled-pricing contracts on PBGs." Op. Mot. Dismiss (Doc. No. 106), at 5 (emphasis added).

**Proskauer»**

Sanofi's decision to implement its anticompetitive bundling scheme in or before 2005 was likely directly related to its desire to protect its absolute monopoly in the meningococcal vaccine business by erecting artificial barriers to entry into that market. Sanofi was granted a license by the FDA to begin selling Menactra, its meningococcal vaccine, in January 2005 and "began selling Menactra vaccine in the U.S. shortly thereafter." Sanofi Answer (Doc. No. 111) ¶ 38. In October 2005, the CDC added meningococcal vaccine to its recommended vaccine schedule, Compl. ¶ 39, meaning that pediatric healthcare providers were essentially required to purchase meningococcal vaccine. Moreover, in October 2005, Novartis announced its intention to acquire the remaining stake in Chiron Corp., a company that was producing and selling a meningococcal vaccine outside of the United States, and developing one for sale here. *Id.* ¶ 36.[2] Sanofi would have been intimately familiar with Chiron's meningococcal vaccine and the consequences of Novartis's acquisition of the company, given that from 2000 until (at least) early 2006, Chiron and Sanofi (then Aventis Pasteur) operated a co-promotion and co-marketing agreement related to Chiron's meningococcal vaccine. Under this agreement, Sanofi assisted in the marketing and selling of Chiron's meningococcal vaccine in the United Kingdom and Ireland, and under which Sanofi distributed, marketed, and sold Chiron's meningococcal vaccine under Sanofi's own label in the rest of Europe. *See* Ex. 18 (Chiron Corp. 2005 10-K), at 6-7. During the time this agreement was in place, both Sanofi and Chiron pursued FDA licensure for their respective meningococcal vaccines. Indeed, in November 2004, Chiron announced its intention to switch its resources to advancing a new quadravalent meningococcal vaccine that would compete head-to-head with Sanofi's soon-to-be-approved Menactra vaccine.[3]

In response, Sanofi submits a declaration from Ms. Laurie McDonald, one of Sanofi's employees, asserting that she is "not aware of the basis" of Plaintiffs' allegation that Sanofi began imposing bundled pricing provisions in or before 2005. *See* Ex. 17. As an initial matter, Sanofi's submission of evidence in the form of a declaration confirms the need for discovery on this issue. Sanofi is attempting to eliminate issues from the case without Plaintiffs having any opportunity to conduct discovery. Moreover, the declarant asserts that she has been administering contracts "for the last six years," *i.e.*, since 2006, not since 2005 or earlier, and thus has no personal knowledge of the relevant issue. *See id.* ¶ 3. Additionally, Ms. McDonald apparently did not undertake—or at least does not describe—any investigation to determine (1) whether Plaintiffs' assertion is true, (2) when Sanofi began using bundling contracts, or (3) whether Sanofi made any relevant changes to their contracts in 2004 or 2005 in connection with

---

[2] *See also* Novartis Oct. 31, 2005 Press Release available at http://dominoext.novartis.com/NC/NCPRRE01.nsf/44aff02a639be034c1256b4b007b5f4d/3a67f d6e65259747c12570ab0045894e/$FILE/Chiron-%20EN%20-%2031.10_FINAL.pdf (Chiron vaccine business included, *inter alia*, meningococcal vaccine).

[3] *See* Chiron Nov. 16, 2004 Press Release available at http://www.infectioncontroltoday.com/news/2004/11/chiron-concludes-phase-iii-program-for-menjugate.aspx

**Proskauer》》**

the release of Menactra or Novartis's acquisition of Chiron. Thus, her lack of awareness of information supporting Plaintiffs' allegation is not sufficient to deny Plaintiffs years of relevant discovery.[4]

In short, it is highly likely that Sanofi was aware of the competitive threat from Novartis (which had purchased Chiron in late 2005), and that it was discussing and devising ways to address that threat, including through the use of the anticompetitive bundling scheme alleged herein. Plaintiffs believe that Sanofi possesses evidence going back to *at least* 2004 showing that it intended to use, and did use, its bundling scheme to foreclose and impede actual and potential competition in the meningococcal vaccine (and other) markets. Sanofi nevertheless argues that any such evidence is not "directly relevant" to Plaintiffs' claims, and thus, is not discoverable absent a showing of "good cause." This argument should be rejected.

*First*, Sanofi invents a new—and incorrect—legal standard when it asserts that the Court must determine "whether the information directly relates to plaintiffs' 'claims or defenses' or whether it is merely relevant to the 'subject matter involved in the action.'" *Infra* at 12 (selectively quoting FED. R. CIV. P. 26(b)(1)). The phrase "directly relates" is not in Rule 26, which only requires that the discovery be "relevant" to the claims or defenses in the case. To the extent Sanofi uses "directly relates" to restrict discovery, Sanofi is contradicting established law providing that documents are discoverable where their production appears "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Indeed, Sanofi's own cited cases embrace a broader view of relevance under Rule 26, and support Plaintiffs' point here. For example, in *Brown v. James*, upon which Sanofi relies, the court found "[i]t is well-settled that Rule 26 establishes a liberal discovery policy," that "discovery is permitted of any items that are relevant or may lead to the discovery of relevant information," and even that "[r]elevancy is not limited to the precise issues set out in the pleadings." *Brown v. James*, 03-CV-06312009, WL 743321, at *3 (M.D. Pa. Mar. 18, 2009).

Likewise, in the only case Sanofi cites from this district, the court concluded that it was reasonable to require the defendant to produce five years of information prior to the act giving

---

[4] Ms. McDonald also asserts that "the specifics of Sanofi's PBG contracts may have changed from time to time," McDonald Decl. ¶ 3, and while she implies that those specifics do not bear on the issue of bundling, Plaintiffs cannot simply take her word for that without discovery. Even assuming for the sake of argument that there was no change to the bundling provisions, Plaintiffs' proposed pre-2008 discovery is still relevant. For example, if Sanofi knew or intended that its bundling contracts would forestall entry by actual or potential meningococcal vaccine competitors, such information would obviously be directly relevant. Likewise, Sanofi's discussions in 2004 and 2005 about plans to address the competitive threat posed by Novartis's competitive product would clearly be relevant, and not obviated by the fact (even if true) that the bundling provisions remained the same throughout the period.

5

**Proskauer »**

rise to the claim. *See Wilson v. Int'l Flavors & Fragrances, Inc.*, No. 09-CV-5475, 2010 WL 1816238, at *6 (D.N.J. May 4, 2010). The case for production here is stronger than in *Wilson*. The plaintiff in *Wilson*, who was claiming age discrimination, was apparently seeking discovery regarding complaints or communications alleging age discrimination that were otherwise unrelated to the plaintiff's claim. *Id.* at *2, 5. The plaintiff asserted that such information would be relevant to proving an "ageist state of mind," which would be relevant to proving discriminatory intent. *Id.* at *5. The court held that "providing five years of information . . . prior to Plaintiff's termination will provide a sufficient scope of information." *Id.* at *6. By contrast here, as described above, evidence going back to 2004 will be relevant to understanding Sanofi's response to the potential threats to its monopoly in the meningococcal vaccine market, and determining the extent to which Sanofi formulated the very monopoly bundling scheme at the heart of Plaintiffs' claims as a means to maintain or increase its monopoly power.

Finally, contrary to Sanofi's suggestion, "[t]his broad scope of discovery 'has been held to be particularly appropriate in antitrust cases.'" *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732, 2008 WL 2275531, at *1 (E.D. Pa. May 13, 2008).[5] "A 'general policy of allowing liberal discovery in antitrust cases' has been observed by this Court because 'broad discovery may be needed to uncover evidence of invidious design, pattern, or intent.'" *U.S. v. Dentsply Intern., Inc.*, No. 99-CV-5, 2000 WL 654286, at *5 (D. Del. May 10, 2000) (allowing discovery of markets other than market pled in complaint) (quoting *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 217 (D. Del. 1985)).

For example, in *New Park Entertainment L.L.C. v. Electric Factory Concerts, Inc.*, No. 98-CV-775, 2000 WL 62315 (E.D. Pa. Jan. 13, 2000)—a case, like this one, with claims under Sections 1 and 2 of the Sherman Act—the court allowed discovery going back several years from before the alleged first injury, including discovery from one third party going back ***seven years*** prior to the alleged injury. The court reasoned that pre-injury discovery, even of potentially legal activity, is relevant to scrutinizing the legality of a restraint on trade because ***"[t]he history of the defendants' activities will shed light upon their illegality***." *Id.* at *2. Despite recognizing that such discovery could be onerous, but the court held that "'discovery in antitrust litigation is most broadly permitted and the burden or cost of providing the information sought is less weighty a consideration than in other cases.'" *Id.* at *3 (quoting *U.S. v. Int'l Bus. Mach. Corp.*, 66 F.R.D. 186, 189 (S.D.N.Y.1974)).

*Second*, Sanofi takes an unreasonably narrow view of the relevance of this potential discovery. For example, although Plaintiffs are not *required* to show Sanofi's intent to monopolize for its claim under Section 2 of the Sherman Act, it is well-established that intent is

---

[5] *See also, e.g.*, *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009); *B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, No. 01-CV-2410, 2003 WL 21939019, at *3 (D. Kan. Jul. 22, 2003); *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa.1996).

**Proskauer>>**

*relevant* "to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive'" under the antitrust laws. *LePage's Inc. v. 3M*, 324 F.3d 141, 150 (3d Cir. 2003 (*en banc*); *id.* at 163 ("The Supreme Court has made clear that intent is relevant to proving monopolization. . . ."). Documents relating to Sanofi's intent with respect to its use of bundling contracts in 2004 and 2005—during the time period in which Novartis was acquiring Sanofi's potential competitor in the meningococcal vaccine market and in which Sanofi was receiving final FDA approval and beginning to sell its own meningococcal vaccine—are clearly relevant within the purview of Rule 26.

In addition to evidence of intent, evidence of Sanofi's possible admissions with respect to the actual or likely exclusionary *effects* of its bundling contracts would also be relevant. For example, documents showing that Sanofi knew that its bundling agreements were likely to exclude, impair, or forestall entry from potential competitors in any pediatric vaccine market, including the meningococcal market, would support Plaintiffs' claims. Again, such evidence would likely be found in files from the time period in which Sanofi was beginning to sell Menactra, and in which Novartis was threatening to disrupt Sanofi's monopoly by acquiring a potential competitor—*i.e.*, in 2004 and 2005.

*Third*, Sanofi incorrectly asserts that "plaintiffs have not identified a <u>single</u> act or <u>event</u> that they can credibly argue occurred between 2004 and 2008 that is relevant to their claims or defenses." *See infra* at 10 (emphasis in original). As discussed above, Plaintiffs allege—and believe to be true—that Sanofi began its anticompetitive scheme in or before 2005, "in direct response to competitive threats." Compl. ¶ 106. While Sanofi also *extended* the anticompetitive reach of its bundling once Novartis entered the market in 2010, *id.* ¶ 107, Sanofi began assembling bundles to secure its monopoly power in the meningococcal vaccine (and other) markets. Thus, evidence related to Sanofi's intent with respect to its bundling scheme and the effects on the market from those bundles, including whether Sanofi intended to use those bundles to impede and slow entry in the meningococcal vaccine market from any actual or potential competitors is directly relevant and should be subject to discovery.[6]

---

[6] Sanofi asserts that it began using bundling contracts prior to 2003, apparently in an attempt to argue that discovery going back to 2004 will not provide any insight into the reasons behind the use of bundling agreements. But putting aside even all of the other events taking place in or before 2005—including Sanofi's approval for and release of Menactra; Novartis's acquisition of Chiron and its meningococcal vaccines; and Sanofi's and Chiron's joint marketing of Chiron's meningococcal vaccines—the fact that the bundling began earlier than 2004 would **support** the existence of relevant evidence going back to 2004. Indeed, it is all the more likely that there were discussions in 2004, among other things, of the interplay between PBG contracts, Sanofi's monopoly on meningococcal vaccines, and the potential future competition from Novartis.

**Proskauer**

*Fourth*, Sanofi itself has used the time period of January 1, 2005 to the present in numerous subpoenas issued to third party physician buying groups ("PBGs") in this case. Thus, Sanofi has recognized that there is likely to be relevant evidence going back at least that far in the hands of the PBGs. *See, e.g.*, Ex. 13 (Sanofi Subpoena), at 4 (defining "Relevant period" as "January 1, 2005 to the present"). Indeed, in one of Sanofi's cited cases, the court specifically found it "somewhat bothersome to the Court that Defendants seek to limit the temporal scope of discovery sought by [the plaintiff] while, at the same time, Defendants are seeking discovery from non-parties that extends farther back in time." *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 05-CV-2164, 2007 WL 950282, at *3 (D. Kan. Mar. 26, 2007). The reason, of course, is that if the burden of searching and producing documents going that far back is appropriate for a third party in Sanofi's view, Sanofi has no legitimate basis for its refusal to produce responsive documents from before 2008, including critical documents at the formative stages of the very anticompetitive scheme at issue in this case.[7]

Moreover, Sanofi served interrogatories and requests for admission on October 1, 2012, in which it instructed Plaintiffs that the relevant time period is January 1, 2004, for the requests for admission, and January 1, 2005, for the interrogatories. *See* Ex. 19, at 8 (requests for admission); Ex. 20, at 4-5 (interrogatories). Sanofi did not indicate that the time period for its 964 requests for admission and 24 interrogatories (several of which have many subparts) was contingent or otherwise designed simply to preserve Sanofi's ability to take such discovery in the event the Court overrules Sanofi's objection. Again, it is contradictory for Sanofi to insist that pre-2008 discovery is irrelevant and unduly burdensome while demanding such discovery from Plaintiffs and third parties.

Finally, in addition to arguing—incorrectly—that pre-2008 evidence is not relevant to Plaintiffs' claims, Sanofi also argues that Plaintiffs are not entitled to pre-2008 discovery with respect to Plaintiffs' defense of Sanofi's Counterclaim. The crux of Sanofi's Counterclaim, which asserts that each PBG and its members are separate buyers' cartels, is that the PBGs use their "substantial market power . . . to demand discounts from vaccine suppliers. . . ." Counterclaim (Doc. No. 111) ¶ 8. As Plaintiffs make clear in their *sub judice* motion to dismiss, Sanofi's Counterclaim is without merit. (Doc. No. 118.) Sanofi alleges further, and implausibly, that "Sanofi is not the perpetrator of the illegality, but the victim of it." *Id.* ¶ 1. Plaintiffs strongly believe that these allegations will be contradicted by discovery showing that when

---

[7] Sanofi asserts that it is only seeking documents going back to January 2005 "to preserve its ability to rebut plaintiffs' characterization of the historical evolution of the market," but this, of course, concedes at least one reason the information is relevant. Further, Sanofi's only cited evidence of its attempts to limit the scope of discovery as to third parties is its agreement with Novartis. But Sanofi's decision to limit its discovery against Novartis to January 2009 to the present is understandable (though unjustified) given that Sanofi would not want Novartis to produce information showing anticompetitive effects going back to 2005 or earlier.

Proskauer≫

Sanofi began entering into bundling contracts with PBGs in or before 2005, *see* Compl. ¶ 106, it was Sanofi that initiated bundling with the PBGs, and that Sanofi was not, as it claims, a victim of the market power of individual PBGs. Again, documents related to Sanofi's motive and intent in establishing relationships with PBGs and its web of bundling contracts will be relevant to Plaintiffs' defense. Many critical documents likely pre-date Sanofi's proposed and arbitrary 2008 cutoff (as Sanofi itself recognizes in its own third party subpoenas going back to 2005).

Sanofi argues that even if there is evidence that PBGs—and the bundling contracts that Sanofi inflicts on purchasers through the PBGs—were encouraged, supported, or devised by Sanofi, such evidence is not relevant to Plaintiffs' defense against Sanofi's Counterclaim because Sanofi's intent is not relevant. But, as discussed above, this is not only contrary to Third Circuit law, but is nonsensical. Evidence showing that Sanofi devised the bundling scheme and set up PBGs to be its instrument of monopolization would obviously undermine any argument that Sanofi is at the mercy of the PBGs. Indeed, Sanofi's central allegation that the counterclaim-defendants' power "is, in part, directly evidenced by the conspirators' ability to control prices," Counterclaim ¶ 37, would be fatally damaged by evidence showing that Sanofi is the one controlling the conditions on which it sells its products and the prices for which such products sell.

In short, Rule 26(b) broadly allows discovery into "any nonprivileged matter relevant to any party's claim or defense," including where the discovery "appears reasonably calculated to lead to the discovery of admissible evidence," and pre-2008 discovery is likely to yield evidence that is directly relevant both to Plaintiffs' affirmative claims and its defense against the Counterclaim. *See* Ex. 3 (Sept. 6 Walker Letter to Kass), at 3-4 (giving examples of relevant pre-2008 evidence likely in Sanofi's possession); Ex. 6 (Sept. 21 Walker Letter to Kass), at 2 (same). Consequently, Plaintiffs respectfully request that the Court order Sanofi to apply a time period going back at least to January 1, 2004 for purposes of its document production.

**Sanofi's Position:**

Plaintiffs' request for an additional four years of document discovery should be rejected. The *speculation* they muster in support of this *doubling* of Sanofi's collection, review, and production costs – that Sanofi possibly might have anticipated Novartis's 2010 entry back in 2004, and introduced bundling six years earlier just to make it more difficult for Novartis to compete six years later – has no basis in fact and does not justify the tremendous burden they seek to impose on Sanofi.

Sanofi has already produced more than a *million pages* of documents covering virtually every area of Sanofi's pediatric business from January 2008 to the present. This production includes not only the entirety of plaintiffs' damages period, but an additional *two years* of discovery prior to the start of their damages period, *two years* prior to Novartis' entry (the alleged foreclosed competitor), and a full *year and a half* of discovery prior to the start of the **sole** act that plaintiffs allege caused them injury: Sanofi's decision to include Menactra in its PBG contracts in mid-2009.

9

Proskauer≫

And yet, with the burden falling exclusively on Sanofi, plaintiffs have pushed for discovery for an additional **four** years, giving it **six** full years of pre-damages discovery. Whatever superficial appeal plaintiffs' arguments have, the reality is that the documents they seek are not actually relevant to the issue of whether purchasers of Menactra from **2010 to the present** have been harmed by Sanofi's PBG contracts.

> *In fact, plaintiffs have not identified a <u>single</u> act or <u>event</u> that they can credibly argue occurred between 2004 and 2008 that is relevant to their claims or defenses.*

That bears repeating: plaintiffs have not identified a <u>single</u> act or <u>event</u> that they can credibly argue occurred between 2004 and 2008 that is relevant to their claims or defenses.

Boiled down to its essence, plaintiffs argue that historical discovery is warranted because the Complaint alleges that Sanofi "began bundling in 2005," when Sanofi started selling Menactra. Cmplt. ¶ 106. Plaintiffs then speculate that Sanofi embarked on this plan because it knew that Novartis (or its predecessor, Chiron) was planning on entering the market sometime in 2010. If this were at all true, then – yes – discovery during the 2004 to 2008 time period might be warranted. But it is not.

Sanofi has already informed plaintiffs and produced a declaration – **signed under penalty of perjury and supported by contemporaneous business records** – that Sanofi's PBG contracts used the same template from 2003 to mid-2009 and covered various non-meningococcal vaccines. Ex. 16 (L. McDonald Decl., ¶ 4). The same declaration establishes that Sanofi changed its PBG contracts in mid-2009, at which time the structure of the administrative fees paid to PBGs changed and Menactra was added to the contract. *Id.* As Ms. McDonald's declaration makes clear there is **no basis** for asserting that any relevant change to Sanofi's PBG contracting policies occurred between 2004 and 2008.[8]

Plaintiffs do not deny any of these facts, or even claim to possess information that casts doubt upon them. Instead, they fall back on their Complaint's allegation and accuse Sanofi and Ms. McDonald of either being uninformed or liars. But if plaintiffs actually had any <u>basis</u> to assert that a relevant change occurred in Sanofi's PBG contracting practices between 2004 and 2008, they have not shared it with us or with the Court. Instead, plaintiffs are improperly

---

[8] Plaintiffs seek to challenge Ms. McDonald's knowledge based on the fact that she has only been in her present position for six years (although she has been with the Company for 20). But that is certainly enough time for her to have become familiar with Sanofi's contracting practices. Moreover, Ms. McDonald attached the relevant business records spanning the entire period from 2003 to 2009 that support her declaration. Thus, plaintiffs' argument that Ms. McDonald is uninformed is specious. In any event, Sanofi itself has made this same representation and, if the Court wishes, it will provide a supplemental declaration.

seeking to "use discovery as a fishing expedition in order to support the basis of a *speculative* pleading," which is 'plainly in violation of the Federal Rules.'" *Atkinson v. Middlesex County*, 2010 WL 398500, at *3 (D.N.J. 2010) (citing *Zuk v. Eastern Pa. Psychiatric Inst. of the Med. College of Pa.,* 103 F.3d 294, 299 (3d Cir. 1996) and *Strait v. Mehlenbacher*, 526 F. Supp. 581, 584 (W.D.N.Y. 1981) ("discovery is not intended as a fishing expedition permitting the speculative *pleading* of a case first and then pursuing discovery to support it; the plaintiff must have some basis in fact for the action.")).

Indeed, there is one simple way to determine whether plaintiffs are improperly seeking to support a baseless, speculative allegation, or are properly seeking admissible evidence in support of a well-pled allegation. The Court should order plaintiffs to produce the information supporting their allegations. If the Court does this we will know soon enough whether plaintiffs have a good faith basis (as required under Rule 11) for their allegations that Sanofi's alleged bundling "began in 2005," that there was a relevant (unspecified) change in Sanofi's PBG contracts between 2004 and 2009, or that either Sanofi or Ms. McDonald is being untruthful.

Seeking to avoid the inquiry into whether plaintiffs have a good faith basis for their speculation, plaintiffs try to turn the tables, arguing that the mere submission of an affidavit creates a fact dispute and "confirms the need for discovery on this issue." But this is a non-sequitor. If plaintiffs' position were true, no party could ever seek to limit discovery on grounds of relevance or proportionality. If Sanofi tried to do so via an attorney's representation (as Sanofi did via letter, see Ex. 9), plaintiffs would complain – as they did in their initial draft of this joint discovery letter – that this representation is not supported by a declaration. If Sanofi tries to submit a declaration (as it did, *see* Ex. 16), plaintiffs would complain that the declaration itself creates fact disputes warranting discovery.

This catch-22 is not the law. In fact, where plaintiffs are seeking discovery for a time pre-dating when the operative act occurred – here, Sanofi's addition of Menactra to its PBG contracts and its effect on Novartis and plaintiffs in 2010 and beyond – the burden falls on plaintiffs to establish the need for it. As the Manual for Complex Litigation notes, "in *antitrust litigation*[,] the court should consider limiting discovery to particular time periods …, *until the relevance of expanded discovery has been established*." *Manual for Complex Litigation (4th)* 11.422. Here, plaintiffs have not established the need for additional discovery.[9]

In determining whether plaintiffs are entitled to seek expanded discovery, this Court must apply the framework established by Rules 26(b)(1) and 26(b)(2), which were amended in 2000

---

[9] Plaintiffs seek credit for "compromising" by scaling back their initial demand for information back to 1998, after this Court expressed incredulity over plaintiffs' position at the last status conference. *See* 7/18/12 Hrg. Tr. 96. But plaintiffs deserve no credit for "compromising" from one overreaching position to another, slightly less overreaching, but still unreasonable position.

because of "concerns about overbroad discovery." Fed.R.Civ.P. 26, 2000 Advisory Comm. Notes. We discuss that framework below. But it is worth noting that plaintiffs do not even *attempt* to apply it. Instead, plaintiffs wrongly claim the "actual standard from Rule 26 … is that relevant discovery need merely appear 'reasonably calculated to lead to the discovery of admissible evidence." Plaintiffs, however, again crop the quote from the actual rule, since as amended, that is but one of *multiple* limits on discovery. In fact, Rule 26(b)(1) establishes a "***good cause***" standard for information – such as that here – that merely relates to the "subject matter" of the suit, and Rule 26(b)(2) imposes a number of other limits, broadly referred to in the case law as the "***rule of proportionality***."[10]

Under the actual standard, the historical discovery plaintiffs seek is not warranted. Under the rule, the Court first determines whether the information directly relates to plaintiffs' "***claims or defenses***" or whether it is merely relevant to the "***subject matter involved in the action***." *Id*.; Fed.R.Civ.P. 26(b)(1). If the latter, such information is *only* discoverable if the *requesting party* establishes "***good cause***" for the information. Fed.R.Civ.P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to a party's claim or defense …. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."). Thus, amended Rule 26(b) shifts the burden regarding need from the responding to the requesting party where information is merely relevant to the *subject matter* of the suit.

If the Court determines that the information falls within the limits of Rule 26(b)(1) – either because it is directly related to a claim or defense or good cause has been established – the Court proceeds to the second step, to determine under Rule 26(b)(2) whether the burden of requiring production outweighs its benefits under the rule of proportionality. Fed.R.Civ.P. 26(b)(2). Under this rule, "courts should 'limit the frequency or extent of discovery' where … the burden of the discovery would outweigh its likely benefit." *Bowers v. National Collegiate Athletic Ass'n*, 2008 WL 1757929, at \*4 (D.N.J. 2008); *Public Serv. Enter. Group Inc. v. Phila.*

---

[10] There is no support for plaintiffs' suggestion that the Federal Rules' basic discovery limitations do not apply to antitrust cases. Plaintiffs' own case, *In re Aspartame Antitrust Litig.*, belies this notion. There, the court held that, while "the scope of permissible discovery is broadly construed, it is not limitless." 2008 WL 2275531, \*2. It, thus, ordered the parties "to meet and discuss reasonable limits that can be placed on Plaintiffs' discovery requests." Plaintiffs also misplace reliance on *New Park Entertainment*, 2000 WL 62315, at \*2. There, plaintiff sought information about specific agreements it contended was illegal and which caused plaintiffs' subsequent injury (after plaintiff entered the market). Here, the provisions of the contracts that caused plaintiffs' alleged injury were entered into in mid-2009. Moreover, unlike in *New Park*, Sanofi has not limited discovery to the date of Novartis' entry – February 2010 – but has already produced documents for the preceeding two years. The rule of proportionality demands no more.

Proskauer»

*Elec. Co.*, 130 F.R.D. 543, 551 (D.N.J. 1990). As this Court has explained, the "purpose of this rule of proportionality 'is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry.'" *Takacs v. Union County*, 2009 WL 3048471, at *1 (D.N.J. 2009) (citation omitted).

Put simply, "the task of the trial court is to balance the clear relevance of the information against the burden on the defendant." *Miller v. Hygrade Food Prods. Corp.*, 89 F. Supp. 2d 643, 657 (E.D.Pa. 2000); *see also Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 WL 950282 (D.Kan. 2007) (rejecting discovery prior to the period for which plaintiff claims competitive injury); *Wilson v. Int'l Flavors & Fragrances, Inc.*, 2010 WL 1816238 (D.N.J. 2010); *Hardrick v. Legal Servs. Corp.*, 96 F.R.D. 617 (D.D.C. 1983) (rejecting five-year discovery period, in favor of a two-year period in an employment discrimination and disparate impact case); *Brown v. James*, 2009 WL 743321 (M.D.Pa. 2009) (rejecting five-year period, in favor of one and half years).

Here, plaintiffs do not attempt to meet the good cause standard (they reject its application), or the rule of proportionality. Instead, they erect a straw man argument, claiming that discovery should be compelled because Sanofi initially defined the relevant period in its own subpoenas and document requests as January 1, 2005 to the present. But Sanofi only did so to preserve its ability to rebut plaintiffs' characterizations of the historical evolution of the market in the event that the Court permits (over Sanofi's objection) plaintiffs' attempt to inject such miscellany into the case. Indeed, in its meet and confers with plaintiffs and every third-party in which the issue arose, Sanofi has ***agreed to limit discovery to January 1, 2008*** unless the Court (again over Sanofi's objection) imposes a longer time period. For example, in negotiating with Novartis, Sanofi limited discovery to *January 2009*. *See* Ex. 14 (Oct. 3 email memorializing Novartis subpoena agreement). Plaintiffs do not deny this.[11]

Moreover, this supposed "gotcha" argument has nothing to do with whether historical discovery is justified under the rules. That depends on relevance and burden. Here, plaintiffs do not deny that doubling the temporal scope of discovery would impose a substantial, one-sided burden on Sanofi. In fact, Sanofi has analyzed the metadata for the ESI it has collected to date to determine the additional number of documents that would need to be analyzed for responsiveness under the expanded temporal scope plaintiffs seek. This analysis shows that, even after filtering such documents according to the agreed-upon search terms, Sanofi would

---

[11] Plaintiffs speculate that Sanofi agreed to limit Novartis discovery to 2009 because there may be some (unspecified) unhelpful pre-existing evidence in Novartis' files. As an initial matter, that speculation is not plausible, in light of the fact that Novartis did not enter the market until 2010. Moreover, if there was evidence that was unhelpful to Sanofi and relevant to the case, plaintiffs would have subpoenaed Novartis themselves, which they have not done.

Proskauer≫

need to analyze an additional 80,000 documents for responsiveness.  Plaintiffs do not deny that this would cause a substantial expense.

With respect to relevance, plaintiffs offer nothing more than smoke and mirrors.  *First*, they speculate that Sanofi formed an intent between 2004 and 2008 to change its PBG contracting practices or add Menactra in mid-2009.  But plaintiffs do not cite *anything* to support their speculation.  Nor do plaintiffs argue that documents from 2004 are likely to discuss Sanofi's *future* intent to use PBG contracts to protect its market share for *Menactra* in 2010 and beyond.  Moreover, Sanofi has already provided plaintiffs with discovery more than a ***full year*** prior to the decision to add Menactra.  Certainly, if anything in Sanofi's production even suggests Ms. McDonald is incorrect or that the decision to add Menactra or change its PBG contracting strategies took place between 2004 and 2008 (rather than 2009), plaintiffs should have identified that evidence by now and explained why it justifies expanding the scope of discovery.  The fact that plaintiffs have not done so shows that they are merely seeking to engage in a fishing expedition at Sanofi's expense.

More importantly, if plaintiffs cannot establish nefarious intent in adding Menactra to Sanofi's PBG contracts in mid-2009 based on the contemporaneous evidence surrounding that decision, the inferences they seek to draw from evidence fully four years (or more) prior will not fill that gap.  As this Court has held, such a tenuous link does not justify an expanded temporal discovery period.  *See Wilson,* 2010 WL 1816238, at *5-6 (*citing Finch v. Hercules Inc.,* 149 F.R.D. 60, 65 (D.Del. 1993)) ("[i]f plaintiff can show a trend of age discrimination in the two years prior to his own dismissal, a similar showing for the four previous years will not add to the evidence. On the other hand, if plaintiff can only show a pattern of discrimination between 1985 and 1989, but not 1989 to 1991, any weak inference that plaintiff was discriminated against in 1991 does not warrant subjecting defendant to the necessity of searching its records for the period 1985 to 1989.").[12]

*Second*, plaintiffs point out that Novartis acquired Chiron's vaccine business in 2005.  But so what?  Plaintiffs offer nothing but base speculation that this acquisition "motivated Sanofi to tighten its hold on all of its vaccine markets."  Indeed, when initially asked what gives rise to plaintiffs' musings, plaintiffs failed to identify even a scintilla of support.  *See* Ex. 9 (Oct. 1 Ltr. from Kass to Walker, at 1-2); Ex. 10 (Oct. 17 Ltr. from Kass to Walker, at 6).  Now, after being confronted with this omission in the prior draft of this joint discovery letter, plaintiffs scrambled to come up with some fantastical theory.  They now claim that Chiron's joint marking relationship with Sanofi in ***Ireland and the UK in 2000*** somehow caused Sanofi to embark on a

---

[12] Plaintiffs' contention that their request for historical information "is stronger than the plaintiff's in *Wilson*" is untrue.  Age discrimination cases entail both "pattern or practice" evidence and satisfaction of a "willful" mental state element.  *See Finch*, 149 F.R.D. at 63. Neither issue is relevant here.

plan in 2004 to foreclose competition from Novartis in 2010. Such nonsense barely warrants a response, let alone justifies doubling the temporal scope of discovery.[13]

*Third*, plaintiffs argue that the 2004 to 2008 historical information may form "part of the story" they want to tell.[14] Specifically, plaintiffs point out that Sanofi received FDA approval for Menactra in 2005. But so what? Scotch tape was invented in 1930. Yet that did not justify seventy years of discovery in *LePage's*. The question is not when Sanofi entered the market, but whether Novartis was foreclosed from competing once *Novartis* received FDA approval in February 2010. And plaintiffs do not claim that Sanofi engaged in any **act** between 2004 and 2008 that foreclosed Novartis or delayed its entry.

*Fourth*, plaintiffs argue that there may be information from 2004 to 2008 relating to the **non-meningococcal** vaccines that may tangentially relate to the state of the market in 2010 and beyond. But just as documents relating to Menactra's entry in 2005 are not relevant to whether Novartis was foreclosed from competing for plaintiffs' meningococcal vaccine purchases in 2010 and beyond, neither are documents relating to Sanofi's sales of other vaccines during this earlier time period. What is relevant is the market as it existed from 2010 to the present. Historical documents are, thus, neither related to the plaintiffs' "claims and defenses" nor are they likely to yield *additional* materially relevant information absent from the four years of discovery Sanofi has already provided in this case. Accordingly, there is no basis for expanding the scope of discovery either under Rule 26(b)(1) or 26(b)(2).

*Fifth*, plaintiffs argue that discovery from 2004 to 2008 is relevant to their defense of the Counterclaim. But this again *assumes* that there was a change in Sanofi's PBG contracting practices between 2004 and 2008, an assumption which plaintiffs do not claim has any basis in fact. Absent such a change, Sanofi's agreement to produce discovery covering the entire damages period, plus an additional six months, is more than sufficient. Moreover, Sanofi has brought a claim under Section 1 of the Sherman Act, not Section 2. And intent is not an *element* of a Section 1 claim. Even if it were, it is *plaintiffs'* intent in joining a PBG, not Sanofi's intent in contracting with the PBG that matters. Plaintiffs are the ones alleged to have entered PBG contracts for the purpose of depressing prices. If plaintiffs assert that they had some other intent, then such evidence would be in their possession, custody, and control, not Sanofi's. Finally,

---

[13] The agreement involving Chiron did not actually involve any U.S. Sanofi entity.

[14] Plaintiffs initially sought to justify their demand for discovery on the ground that it might help them tell "part of the story." When Sanofi explained in a prior version of this joint discovery letter that the "part of the story" rationale may make information relevant to the subject matter of the suit (hence triggering the good cause standard) but does not make it relevant to plaintiffs' claims and defenses, plaintiffs changed the wording of their argument. Nonetheless, it is clear that the plaintiffs are merely on a fishing expedition to see if there are shreds of paper (or ESI) that may add some historical color, but are not truly relevant to any claim or defense.

**Proskauer>>**

even if Sanofi's intent were relevant, four years of discovery relating to Sanofi's actual experiences with its PBG contracts should suffice.

## 2.  *Hard Copy Documents*

The parties have been unable to reach agreement concerning who should bear the cost of searching for, collecting, processing, reviewing, and producing hard-copy documents.  Plaintiffs assert that Sanofi should be required to search for and produce relevant, non-privileged documents maintained by Sanofi in hard copy format at its own cost.  Sanofi believes that such information is duplicate or cumulative of the one million pages of electronically stored documents Sanofi has already produced, and is unlikely to add materially to the resolution of the issues in the case.  Sanofi believes that such information should either be excluded from the production entirely or the Court should require plaintiffs to pay for a share of the costs of searching for and producing this information. The parties have discussed this issue extensively, in multiple letters between counsel for the parties and during the September 6 meet-and-confer teleconference.

**Plaintiffs' Position:**

Plaintiffs' document requests encompass both electronically stored information ("ESI") and document maintained in hard copy format.  Sanofi refuses, however, to search for or produce *any* hard copy documents without a prior agreement by Plaintiffs to split the costs of such production, including not only the costs of imaging and processing the documents, but also the cost of Sanofi's counsel's reviewing the documents for responsiveness prior to production. Although Sanofi offered a self-serving declaration and series of questionnaires related to the existence of hard copy documents, as discussed below, none of that evidence addresses the critical questions necessary to determine whether the discovery should be denied or costs should be shifted.  Consequently, Plaintiffs respectfully request that the Court order Sanofi to search for, collect, and produce all relevant, responsive, nonprivileged hard copy documents in its possession.

The presumption is that the party responding to requests for production—in this case, Sanofi—bears the expense of complying, although Sanofi may invoke the Court's discretion under Rule 26(c) to protect it from "undue burden or expense" by allocating discovery costs to Plaintiffs.  *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978).  In deciding whether to invoke Rule 26(c)'s protection from "undue burden or expense," courts generally consider the Rule 26(b)(2)(C) factors:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

      (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

      Moreover, "the party asserting [the undue burden or expense] objection . . . has the burden to show not only undue burden or expense, but that the burden or expense is unreasonable in light of the benefits to be secured from the discovery. This burden typically imposes an obligation on the objecting party to provide an affidavit or other evidentiary proof of the time or expense involved." *Cardenas v. Dorel Juvenile Group, Inc.*, 232 F.R.D. 377, 380 (D. Kan. 2005) (footnote omitted).

      Sanofi has not offered evidence that satisfies any of the Rule 26(b)(2)(C) factors. Indeed, despite submitting a self-serving declaration and numerous "questionnaires," Sanofi has nonetheless failed to provide the information necessary to determine whether Plaintiffs' requests are unduly burdensome, including information as to: (a) whether there are relevant and responsive hard copy documents; (b) the nature and volume of any such documents; (c) whether and to what extent such documents are actually cumulative of the ESI produced by Sanofi; or (d) whether the discovery may be obtained by Plaintiffs from less expensive or more readily available sources.[15]

      *First*, Sanofi submitted a declaration (Ex. 16, Auth Declaration) and questionnaires from a number of its custodians purporting to show that hard copy documents are cumulative of ESI. But none of these documents (nor Sanofi's assertions in this letter) suggests that Sanofi has undertaken any effort to determine whether there are responsive hard copy documents, the nature of such documents, and whether they are, in fact, duplicative. Instead the self-serving

---

[15] Notably, during the two months of conferring over discovery, including this issue, Sanofi concededly made no attempt to investigate whether, in fact, there are hard copy documents responsive to Plaintiffs' requests. Ex. 6, at 2. Sanofi had merely offered its counsel's unsupported assertions that "[i]n today's day and age, it no longer makes sense to require the automatic production of hard-copy documents, since the information is those documents is most likely going to be duplicative of electronically stored information," Ex. 2, at 8, and that "this is not the kind of case in which post-it notes, hand-edits, telephone messages, and the like are likely to play a role," Ex. 5 (Sept. 18 Letter from Kass to Walker), at 3-4. It was only in connection with this joint discovery letter that Sanofi's counsel created and collected the self-serving—and otherwise unavailing—declarations and "questionnaires" that it now offers as evidence. This tactic violates the spirit of Civ. L.R. 30.7, and it shows that Sanofi's decision to withhold hard copy documents is not driven by the information it gleaned from the questionnaires, but rather, that the questionnaires and declaration are simply an attempt to justify its decision to unilaterally limit all hard-copy discovery.

**Proskauer≫**

declaration and questionnaires hedge by using vague or conclusory assertions, including that "in **almost all cases** the hard copies in their files are print outs," Auth Decl. (Ex. 16) ¶ 7 (emphasis added); that "any salient points [of written recordings of conversations] would be **highly likely** to be summarized or memorialized in emails or other electronically stored written communications," *id.* (emphasis added); and that "[i]n **almost all cases**, the hard copies in my files are print outs . . . ," Questionnaire (Ex. 16), Question No. 1 (emphasis added). But even assuming these wholly untested statements are true, there is every reason to believe that these hard copy documents are directly relevant, significant documents. And, of course, Sanofi has offered no evidence showing that it has made any attempt to determine whether the hard copy documents that do exist are important or relevant.

*Second*, the custodians' assertions that "hard copy documents with handwritten notes . . . represent a small portion of [the custodians' files]," Questionnaire (Ex. 16), Question No. 4, belies any assertion that the collection, review, and production of such documents would be unreasonably expensive. In any event, without any attempt to investigate the situation to determine what "a small portion" means to each custodian, the assertion does not enable either Plaintiffs or the Court to determine whether production of such documents is unduly burdensome.

*Third*, the Auth Declaration and the questionnaires contain numerous legal conclusions by non-lawyer employees of Sanofi. For example, the questionnaire has the respondents asserting that hard copy documents "are mostly duplicative of electronically stored information." Questionnaire (Ex. 16), Question No. 4. But whether documents are cumulative of other evidence, for purposes of the rules governing discovery, is a legal issue that involves, at a minimum, an understanding of the information that was produced and the legal significance of the evidence. There is no evidence that the respondents know what Sanofi already produced or what documents Plaintiffs have requested. Thus, there is no indication that the respondents or declarant understood the legal ramifications of their statements.

*Fourth*, even if hard copy documents, such as handwritten meeting notes, were often later memorialized in ESI, the two types of documents have different evidentiary value. Without question, the contemporaneous notes of a meeting will be viewed differently by a jury, and can be used differently with witnesses, than later summaries (if there was a summary), especially if such later summarize synthesize or edit the handwritten notes. It is by no means certain—and is frankly hard to believe—that every handwritten note would be duly transcribed, in exact detail, and then preserved electronically.

In short, Sanofi's unsupported assertions of burden do not provide the information necessary for Plaintiffs or the Court to assess the relevance, importance, cumulativeness, or relative burdens and benefits of the production of hard copy documents, and those considerations are central to assessing whether production of hard copy documents would inflict "undue burden or expense." Sanofi has had ample time and opportunity to investigate the issue and provide detailed objections, and it failed to do so. Consequently, Plaintiffs respectfully request that the Court order Sanofi to produce, at its expense, all relevant and nonprivileged hard copy documents responsive to Plaintiffs' requests for production.



**Sanofi's Position:**

Were the relevant standard governing this issue whether or not there may exist, in the files of a large multi-national company that touches the lives of millions of people through its supply of life-saving vaccines, a handful of hard copy documents that may plausibly relate to a complaint contending that the very sale of those vaccines violate the antitrust laws, and that the cost of identifying, reviewing, and producing such documents could not be considered, then Sanofi would concede this issue and focus on the other contentions. But that is not the standard.

Plaintiffs have not identified any specific type of information that is important to their case that is unlikely to have been captured by Sanofi's extensive search; indeed they have not even reviewed all of the over one million pages of documents relating to Sanofi's pediatric vaccines that have been produced to date. This includes database information, financial information, emails, memos, spreadsheets, correspondence, powerpoints, and virtually every type of communication that occurs within a large FDA-regulated vaccine business.

Nonetheless, plaintiffs argue that Sanofi should be required to – not only produce this ESI – but also go office-by-office to collect the miscellaneous shreds of paper that may somehow relate to Sanofi's pediatric vaccines business. But these documents are unlikely to contain any information that is materially new or different in kind from the information Sanofi already produced. Indeed, *in negotiations with both Novartis and GSK, Sanofi has agreed to defer all hard-copy production*. *See* Ex. 14 (Oct. 3 email memorializing Novartis subpoena agreement, ¶ 7); Ex. 15 (Sept. 20 Ltr. from Kass to GSK, at 2).

Even so, Sanofi has not taken a hard-line against hard-copy production to plaintiffs. It simply asks plaintiffs to contribute to the effort. If they truly believe the information is important, they should pay a _portion_ of the costs associated with it.

Plaintiffs have no compelling argument for why they should not bear a *portion* of the cost. This is an antitrust case. Prevailing plaintiffs are entitled to reasonable attorneys fees and the costs of the suit. 15 U.S.C. § 15. Thus, if this information is material to plaintiffs' case, they should be willing to *advance* these costs, knowing full well that they will be able to recover all of them later if they prevail.

Under the Federal Rules of Civil Procedure, this Court has the discretion to impose a fair allocation of costs among the parties. "Where a party multiplies litigation costs by seeking expansive rather than targeted discovery, that party should bear the expense." *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 430 (S.D.N.Y. 2002); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 316 (S.D.N.Y. 2003) (while responding party typically must bear burden of responding to discovery, court has discretion – under the rule of proportionality – to "condition[] discovery on the requesting party's payment of the costs of discovery."); *Semsroth v. City of Wichita*, 239 F.R.D. 630, 634 (D.Kan. 2006) ("court may order the party seeking discovery to pay the expenses caused thereby though it is not required to do so") (quoting 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure, § 2038 (2d ed.1994)); Fed.R.Civ.P. 34, *1970 Advisory Comm. Notes* ("courts have ample power

19

**Proskauer>>**

under Rule 26(c) to protect respondent against undue burden or expense, either by restricting discovery or requiring that the discovering party pay costs").

As plaintiffs acknowledge, in determining whether to shift a portion of the hard-copy production costs to plaintiffs, the Court must determine whether such information is *either* (i) "unreasonably cumulative *or* duplicative" of Sanofi's existing ESI production, *or* (ii) the "burden or expense" of producing the hardcopy documents "outweighs its likely benefit," considering "the importance of the discovery in resolving the issues." *See* Fed.R.Civ.P. 26(b)(2)(C). If the Court finds either of these criteria to be met, the Court "must" limit the discovery, or alternatively, shift the cost to the requesting party. *Id.*

Here, the hard-copy documents are both unlikely to materially aid in "resolving the issues" in the case, and are cumulative or duplicative of Sanofi's ESI. This is not a case – like criminal price-fixing – where the defendants take conscious efforts to conceal their tracks, and resort to handwritten marginalia of secret meetings. This case turns on the effects of a long-standing corporate policy and practice. The evidence relating to the policy's purpose and effect (and any material changes to it) will be found in the company's business records, including memos, emails, sales reports, and strategy plans, all of which are maintained electronically.

Plaintiffs do not argue to the contrary. Nor have plaintiffs analyzed Sanofi's extensive production and determined that there are significant deficiencies that warranted an additional search for hard-copy documents. *See Tucker v. Am. Int'l Group, Inc.*, 281 F.R.D. 85, 96 (D.Conn. 2012) ("Because plaintiff has engaged in extensive, alternative, duplicative, and likely less burdensome, discovery with respect to defendants and Journal Register, absent a showing that plaintiff either cannot obtain—or in fact has not obtained—ample discovery on the essential elements of her claim, the Court will refrain from ordering yet another broad and costly search of Marsh's computer records and policies in search of emails which may not exist.").

Instead, they claim that Sanofi has not done enough to establish the need to shift costs. Not so. Sanofi has discussed the issue with each of its custodians, and determined that their hard-copy documents are unlikely to have material, non-duplicative information. As the attached declaration from Sanofi's in-house Manager of Legal Affairs, Robin Auth, states:

> "[I]n almost all cases the hard copies in [the custodian's] files are print outs of electronic mail, databases, and electronic documents."

> "These custodians confirmed that, to the extent they engage in written communications, either internally within the company or with third parties, such communications would take place via electronic communications, such as email."

> "These custodians also confirmed that, to the extent they engage in verbal communications with third parties and others, any salient points would be highly likely to be summarized or memorialized in emails or other electronically stored written communications."

Proskauer»

> "This would include, for example, passing on relevant information to their superiors or reports."

> "Finally, the Custodians told me that, to the extent that they have hard copy documents with handwritten notes, such documents would represent a small portion of their documents and are mostly duplicative of electronic mail, databases, and electronic documents."

*See* Ex. 17 (Auth Decl., ¶ 6). These statements are supported by signed questionnaires by each of the relevant custodians. *Id.* Nor should these statements be surprising. In today's day and age, business is typically conducted electronically. Important communications and decisions are invariably later reflected either in confirming emails; reports to the employee's juniors, superiors, or others with an interest in the matter; and business plans and strategies. Put simply, corporate information – of almost every sort – is maintained in "virtual" file cabinets, not physical ones. Thus, absent a showing that handwritten marginalia or notes are _likely_ to contain information that is _unlikely_ to be reflected in ESI, the production of ESI should suffice.[16]

In response, plaintiffs challenge the declaration and questionnaires on a variety of grounds. None have merit. *First*, plaintiffs call the declaration self-serving. Presumably, plaintiffs would call any declaration that they didn't write themselves or that does not support their position "self-serving." That is not the law. *See, e.g., See Cellular Radio Corp. v. OKI America, Inc.*, 664 A.2d 357, 360 (D.C. 1995) (district court's disregarding of "self-serving" affidavit was improper on summary judgment; unless assertions are "patently impossible" they should be credited). In any event, plaintiffs cannot both claim that a declaration is required and then say that it should be disregarded once it has been provided. *Second*, plaintiffs argue that the declaration does not do enough to inform them of what each excluded document says. Again, presumably, plaintiffs would only be satisfied if Sanofi actually conducted the discovery first, determined what was responsive, summarized it for plaintiffs, and then refused to produce it. That is an unworkable demand. In fact, Sanofi went to each custodian and asked them about their business practices. That should be sufficient for the Court to evaluate whether hard-copy documents are likely to be largely cumulative or duplicative of ESI. Third, plaintiffs argue that there may be some important hard-copy documents, without ever specifying what those might be. The solution to that problem is simple: If plaintiffs believe that hard-copy documents have value, they should be willing to pay for a portion of the costs of collecting and processing them.

---

[16] Plaintiffs have appeared to be taken with Sanofi counsel's turn-of-phrase regarding "today's day and age," repeating it in every communication between the parties since this issue arose. But in every day and age discovery obligations evolve, and plaintiffs likely find good company with resisters of former times who presumably insisted their adversaries continue to search for telegraph wires, carbon sheets used for producing copies, etc. well after the usefulness of doing so expired.

**Proskauer》**

Here, the costs of producing this information are substantial. As Ms. Auth explained, the production of hard-copy information "requires significant disruption of our business, since it cannot be simply downloaded automatically by our Information Systems group. Instead, we will need to manually search each of the Custodian's offices and related workspaces. The documents also have to be boxed, shipped to a copy vendor, scanned, OCR'd, shipped back to the corporate headquarters, unpacked, and placed back in their original locations, on a document-by-document basis. Once the documents have been scanned and OCR'd, … they will need to be processed by our e-discovery vendor, and ultimately reviewed for responsiveness." Ex. 17 (Auth Decl., ¶¶ 8-9). The costs of producing this information is likely to exceed $55,000. *Id*. Here, plaintiffs do not deny this.

Most importantly, this Court need not make a final determination of whether hard-copy documents are "unreasonably cumulative or duplicative," or whether the information will materially further the resolution of the issues in the case. Instead, the Court can simply let the parties decide for themselves, so long as each party has adequate incentive to act reasonably. Obviously, if demanding unlimited discovery is costless to the demander, then the demander will demand unlimited discovery. But if it must pay for the costs it imposes on others, then it would limit its demands to information that is reasonably likely to aid in the resolution of the issues in the case, as required by Rule 26(b)(2)(C). Conversely, if the responding party did not need to bear any of the costs for refusing to produce the information, it would simply refuse. Thus, the most reasonable approach is to split the costs down the middle. And that is all Sanofi is asking for. Nothing could be more reasonable.

3. **Communications Between Counsel and Third-Parties**

Plaintiffs' RFP No. 87 requests "All documents produced to Sanofi or Sanofi's counsel by any third party, whether produced voluntarily or pursuant to subpoena or compulsory process, that relate to this case." In response, Sanofi objected, *inter alia*, "on the basis of attorney work product to the production of any affidavits or declarations that Sanofi intends to use solely for impeachment purposes." Ex. 12 (Sanofi Obj. and Resp. to Pls.' Third RFPs), at 10. The parties discussed this objection extensively by letter and email, and in both meet-and-confer teleconferences. Sanofi's position is that it will not produce communications between Sanofi's counsel and third parties, including "affidavits that Sanofi currently intends to use – if at all – solely for impeachment." Ex. 5, at 4.

**Plaintiffs' Position:**

Sanofi apparently intends to withhold communications between Sanofi's counsel and third-parties except for affidavits it intends to use for purposes *other* than impeachment. In support of its position, Sanofi incorrectly asserts that it may withhold not only final affidavits or declarations from third parties, but also any related drafts and communications, on the basis that such documents are protected from discovery under Rule 26(a) and the work-product doctrine. But Sanofi offers no legitimate basis for its blanket refusal to produce *all* communications between its counsel and third parties with respect to this litigation, particularly given the fact that

22

![Proskauer logo]

*Sanofi demanded, and Plaintiffs have already produced, communications between Plaintiffs' counsel and non-consultant third parties related to this litigation*.  *See infra* at 24.

While Rule 26(a), upon which Sanofi relies, provides that a party's *initial disclosures* need not identify witnesses or other evidence to be used solely for impeachment, it is well-established that Rule 26(b), which governs discovery generally, does not provide for a similar limitation.  "The fact that the party responding to discovery intends to use the material only for impeachment does not take it out of the realm of discoverable material if it is otherwise relevant."  *Elion v. Jackson*, 544 F. Supp. 2d 1, 7 (D.D.C. 2008) (quoting 8 Charles Alan Wright, Arthur Miller, et al., FEDERAL PRACTICE AND PROCEDURE § 2011 at 96 (2007 Supp.); *see also* Ex. 6, at 3.  Thus, Sanofi's assertion that it need not produce otherwise relevant, nonprivileged, and responsive documents that it intends to use solely for impeachment is incorrect.[17]

Additionally, the work-product doctrine does not protect statements or affidavits from potential fact witnesses (the only kinds of affidavits or statements that could possibly be used for impeachment), as they are necessarily statements of relevant facts from potential witnesses in this case, and thus, are the very type of document that should be subject to discovery and not protected by arbitrary designation as "trial preparation materials."  The mere fact that an attorney had a role in drafting a third party affidavit "in itself does not suffice to convert what is otherwise purely factual testimony by an affiant into work product.  Caselaw, the nature of testimony itself, and the underlying purposes of the work product doctrine compel this conclusion." *Ford Motor Co. v. Edgewood Props., Inc.*, 257 F.R.D. 418, 422 (D.N.J. 2009).

Moreover, the only argument Sanofi has proffered for withholding such third party affidavits and communications is that such information might enable Plaintiffs to "obtain insights into the issues that Sanofi deems sufficiently important to have a witness reduce to writing." Ex. 5, at 4. But, Plaintiffs seek to discover the identity of these third party affiants, communications between Sanofi or Sanofi's counsel and the affiants or witnesses, and the facts they know regarding the issues in this case.  Moreover,

> Attorneys frequently work with witnesses to prepare their statements, and an attorney's choice to confine testimony to certain areas is inherent in their

---

[17]  Indeed, Sanofi asserts that it "currently" has only one signed declaration that purports to memorialize facts known by a former employee, and which Sanofi intends to use to ensure that the former employee tells a story that Sanofi likes.  *See infra* at 25-26.  There is no question that the declaration contains a relevant factual account by a third party, and there is nothing in the rules that allows Sanofi to shield relevant, responsive facts solely because it only wants to disclose those facts at a time convenient to Sanofi, and if the witness tells a story that Sanofi does not like.

Proskauer>>

preparation. Expanding the doctrine in this area would render otherwise discoverable statements protected by the doctrine, the primary purpose of which is to protect counsel's trial strategies and mental impressions, not its choice as to an affiant's testimony of underlying facts.

*Ford Motor*, 257 F.R.D. at 423. Moreover, Sanofi's concern that it will be "hamper[ed]" in its willingness to reach out to third parties is an odd position, given that Sanofi also argues strenuously *in this letter* that Plaintiffs' counsel's communications with various third parties, including their own expert consultants, are discoverable.

Sanofi offered to produce "*signed* affidavits or declarations from third-parties" in exchange for Plaintiffs giving up their request for any other such communications with third parties. Ex. 9 (Oct. 1 Letter from Kass to Walker) (emphasis added). This proposal is unacceptable because it presents an obvious easy loophole to avoid producing relevant information—*i.e.*, by leaving the affidavit or declaration "unsigned," and thus unproduced, until Sanofi is ready to use it. Additionally, any such drafts of third-party declarations or affidavits, as well as related communications with third parties, should not receive blanket protections under the work-product doctrine where they merely represent statements of relevant fact within the personal knowledge of certain witnesses. *See, e.g.*, *Infosystems, Inc. v. Ceridian Corp.*, 197 F.R.D. 303, 306-07 (E.D. Mich. 2000).

Finally, if the Court determines that draft declarations or affidavits are protected by the work-product doctrine, Plaintiffs believe that any relevant and responsive communications between Sanofi's counsel and any third parties—including any relevant documents or facts communicated among such third parties and Sanofi's counsel—are not protected from disclosure by the work-product doctrine, and should be produced.[18]  Indeed, Sanofi requested—and Plaintiffs have already produced—communications between Plaintiffs' counsel and non-consultant third parties pursuant to Sanofi's requests and subsequent emphatic demands. Moreover, except for vague assertions that such communications are work product, Sanofi has offered no reason why such documents are not discoverable. And, indeed, when demanding that Plaintiffs' counsel produce communications between Plaintiffs' counsel and third parties, Sanofi never conceded that such documents are protected by the work product doctrine. Given Sanofi's conduct here in discovery, it should be estopped from now asserting that it may withhold the very types of documents it has strenuously demanded Plaintiffs produce.

---

[18] The communications referred to here do not include interview notes or memoranda, and to the extent any such notes or memoranda reflect the thought process of counsel, Plaintiffs do not seek to discover them. Of course, if such documents are withheld, they should be logged in accordance to any decision by the Court as to which documents must be logged.

Proskauer »

For the foregoing reasons, Plaintiffs respectfully request that the Court order Sanofi to produce *all* third-party affidavits or declarations, including drafts of such affidavits or declarations and any related communications.[19]

**Sanofi's Position:**

Sanofi has already produced all responsive non-privileged communications between Sanofi and any third party found within the scope of its custodian search. Plaintiffs, however, are seeking to go beyond this to obtain interview memoranda, draft affidavits, signed declarations, and other communications between Sanofi's *counsel* and potential fact witnesses. Sanofi objected to this request, but agreed to produce signed declarations that it intends to use to support its claims or defenses "unless solely for impeachment."

Plaintiffs' rejected this proposal, arguing that – even in the absence of a showing of "*substantial need*" – Sanofi must produce all signed declarations (regardless of their intended use), as well as drafts and other communications between counsel and these potential fact witnesses. Plaintiffs' demand impinges on the protections afforded to "trial preparation materials," and thus, their request should be denied. Fed.R.Civ.P. 26(b)(3). Because a different analysis (potentially) applies to signed declarations and other communications, Sanofi addresses each below.

But before turning to the legal analysis, Sanofi will address plaintiffs' fairness argument – that it would be unfair to allow Sanofi to claim privilege because plaintiffs already produced (some) of their communications with third-parties. Sanofi certainly cannot be estopped from asserting privilege over its communication just because plaintiffs failed to assert privilege over theirs. Moreover, Sanofi did *not* insist that plaintiffs produce all their communications with third-parties, it insisted that they produce *or log* them. Thus, Sanofi's position has been consistent. It is also not clear that plaintiffs have in fact produced all their third-party communications or are continuing to withhold some of them, since they have not yet produced a privilege log. In that regard, plaintiffs have not said that they are forever waiving any right to claim privilege over such communications. To the contrary, they are – now – claiming privilege over their communications with Navigant, which, as explained below, is a *fact witness*, at least for some purposes.

_____

[19] If the Court is not inclined to order such production, Plaintiffs respectfully request that the parties be required to produce, at a minimum, *substantially final or signed* third-party declarations or affidavits, *as well as* related communications and any relevant facts or documents communicated by third parties. Plaintiffs also ask the Court to require timely disclosure of any such third party affiants, as Plaintiffs are obviously concerned with the potential for sandbagging and/or concealment of relevant evidence and witnesses during the course of discovery.

**Proskauer>>**

In any event, there is no _legal_ basis for rejecting Sanofi's properly asserted claims of privilege.

### A.    Signed Declarations

Sanofi currently has one signed declaration, which Sanofi's attorneys requested of a (now) former Sanofi employee for use in the event that issues arise in the litigation for which this person has knowledge.  But Sanofi does not intend to use this declaration affirmatively.  Rather – to the extent it contains facts that may at some point be injected into the litigation – Sanofi intends to reduce those facts to admissible evidence via deposition and/or trial testimony, using the affidavit solely for impeachment purposes if the witness does not testify consistent with the declaration.

Sanofi has resisted production of this declaration for two reasons.  _First_, Sanofi is concerned that plaintiffs will take the declaration and use it as a means to coach the declarant or other witnesses in advance of any deposition.  (Notably, the Discovery Confidentiality Order in this case would permit such tactics).  _Second_, as a matter of policy, Sanofi is concerned that a rule requiring Sanofi to produce such declarations will hamper its willingness to reach out to potential third-parties and obtain potentially useful information about issues that plaintiffs have not yet injected in the case.  Put simply, ordering production will chill Sanofi's trial preparation efforts.[20]

Rule 26(b)(3) was designed precisely to avoid these consequences.  That rule is the starting point for determining whether signed declarations are discoverable.  A signed declaration is considered a "previous statement," as defined in Rule 26(b)(3)(C).  _See_ Fed.R.Civ.P. 26(b)(3)(C) ("A previous statement is either (i) a written statement that the person has signed or otherwise adopted or approved, or (ii) a contemporaneous … transcription … that recites substantially verbatim the person's oral statement").

The discoverability of "previous statements" depends on _who_ is seeking production of the statement.   Under Rule 26(b)(3)(C), if the person is seeking his or her "_own_ previous statement," there is no need for a showing of "substantial need."  If a party is seeking production of another person's statement then, under Rule 26(b)(3)(A), the party must "sho[w] that it has a substantial need for the materials to prepare the case and cannot, without undue hardship, obtain their substantial equivalent by other means."

---

[20] _Holmgren v. State Farm Mut. Auto. Ins. Co._, 976 F.2d 573, 576 (9th Cir.1992); _Castaneda v. Burger King Corp._, 259 F.R.D. 194, 196 (N.D.Cal.2009) ("The purpose of the work product doctrine 'is the promotion of the adversary system by safeguarding the fruits of an attorney's trial preparations from the opponent'") (citation omitted).

Proskauer »

Here, plaintiffs are seeking production of *another* person's previous statement. This means that they must show that they have a "substantial need." Plaintiffs, however, have made no attempt to satisfy this standard.

Instead, they assert that "previous statements" are not – and never can be – considered "trial preparation materials" because they simply lay out facts. But the definition of "trial preparation materials" does *not* depend on whether the materials relate to facts versus "mental impressions, conclusions, opinions, or legal theories." That distinction makes a difference *after* a party has made a showing of "substantial need," not whether the information constitutes trial preparation materials in the first instance. *Compare* Fed.R.Civ.P. 26(b)(3)(A) and 26(b)(3)(B). Thus, under these rules, while mental impressions are *never* discoverable, even with a showing of substantial need; facts are discoverable but only *after* such a showing.

In determining whether a previous statement qualifies as "trial preparation material," the sole question is whether it was "prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney)." Fed.R.Civ.P. 26(b)(3)(A). Here, plaintiffs do not claim that signed declarations fall outside this definition. Thus, plaintiffs would need to show substantial need. But they have not made this showing, and cannot do so, since this is not a case where Sanofi amassed information from otherwise unavailable witnesses.

In response, plaintiffs obfuscate the legal analysis by pointing to Rule 26(a). But it is Rule 26(b)(3) that governs the discoverability of trial preparation materials, not Rule 26(a). Nor is the invocation of Rule 26(a) proper just because Sanofi agreed to produce (on an agreed-upon schedule) declarations it intends to use to support its claims and defenses, rather than for purposes of impeachment.

The reason Sanofi offered to produce declarations it intends to use affirmatively (rather than for impeachment purposes) is due to the interplay between Rule 26(b)(b)(3) and Rule 56(c), not Rule 26(a). Under Rule 56(c), parties may present a *proffer* of expected trial testimony via affidavit or declaration. See Fed.R.Civ.P. 56(c). After such declarations have been disclosed, the party can no longer claim that it constitutes "trial preparation materials." To avoid surprise, however, Sanofi noted that it may be willing to agree to the *advance* production of such affidavits under a mutually-agreeable Rule 16 case management schedule. But this purpose is not served by requiring the production of declarations intended for use solely as impeachment material, since it does not reflect information that a party intends to present as a *proffer* of expected trial testimony under Rule 56(c). Thus, in the absence of a showing of substantial need, the only purpose of requiring disclosure of such impeachment material would be to give the opposing party insight into the other party's thought processes. Thus, impeachment declarations fall squarely within the definition of "trial preparation material."

In rebuttal, plaintiffs cite to *Ford Motor Co. v. Edgewood Props., Inc.*, 257 F.R.D. 418, 422 (D.N.J. 2009). In *Ford*, the court held, after reviewing the affidavit in camera, that it was not entitled to work product protection because it contained pure facts, and not the thoughts, mental impressions, or legal strategies of counsel.

27

The basis for the Court's decision, however, is not easily discernable. Specifically it is unclear whether the court simply *assumed* that the requesting party had made a showing of substantial need, and thus, proceeded to determine whether the disclosure was permissible based on whether it contained mental impressions. *See* Fed.R.Civ.P. 26(b)(3)(B) (noting that, if the court orders discovery of [trial preparation materials], it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney). Or alternatively, whether it held that "facts" can never be considered "trial preparation materials," and thus, must be produced even absent a showing of substantial need.

The lack of clarity from this opinion arises because the court never sought to determine whether the affidavit there fit within the definition of "trial preparation materials," as defined by Fed.R.Civ.P. 26(b)(3)(A). Nor did it discuss the interplay between that rule, the rule governing the protection of mental impressions under Fed.R.Civ.P. 26(b)(3)(B), and the rule governing previous statements under Fed.R.Civ.P. 26(b)(3)(C). Instead, it focused only on tangentially relevant first principles that animate the common law "work product" doctrine.

To the extent that *Ford* held that "previous statements" relating to "facts" can never – as a matter of law – constitute "trial preparation materials," and thus must be produced even absent a showing of substantial need, it is inconsistent with the Federal Rules of Civil Procedure. To the extent *Ford* was based on an assumed showing of substantial need and focused solely on whether affidavits contain "mental impressions," it was rightly decided, but has no application here (because plaintiffs have not established substantial need). Accordingly, Sanofi should not be required to produce signed declarations used solely for impeachment purposes.

## B. Draft Declarations and Other Counsel Communications

Regardless of whether signed declarations are discoverable, it is clear that draft declarations, interview memoranda, and related communications are not.[21] Again, Rule 26(b)(3)(C) is instructive, as it expressly makes this distinction, noting that a "previous statement is either (i) a written statement that the person has signed or otherwise adopted or approved; or (ii) a contemporaneous … transcript[t] … that recites substantially verbatim the person's oral statement." Draft affidavits and interview memoranda are neither. Indeed, by their nature, draft affidavits and interview memoranda are *not* testimonial in nature.

---

[21] Plaintiffs seek to draw a distinction between interview memoranda that contain "mental impressions" and those that do not. *First*, there is no clear dividing line, unless the court were to review each interview memorandum *in camera* and make a case-by-case determination. *Second*, the issue is irrelevant, since Rule 26(b)(3)(B)'s distinction between "mental impressions" and "facts" is only triggered after plaintiffs have made a showing of "substantial need" under Rule 26(b)(3)(A)(ii).

Accordingly, most courts "consider draft affidavits and communications with counsel relating to affidavits as covered by the attorney work product doctrine." *Randleman v. Fid. Nat'l Title Ins. Co.*, 251 F.R.D. 281, 285 (N.D. Ohio 2008); *Tuttle v. Tyco Elecs. Installation Servs., Inc.*, 2007 WL 4561530, at *2 (S.D. Ohio 2007); *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 155 (S.D.N.Y. 2007); *United States v. Univ. Hosp., Inc.*, 2007 WL 1665748, at *1 (S.D. Ohio 2007); *Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 608-09 (D.Nev. 2005); *SEC v. Talbot*, 2005 WL 1213797, at *1 (C.D.Cal. 2005) (concluding a memorandum of an attorney's interview with a witness was protected work product notwithstanding the presence of factual information).

Even courts that have considered *Ford* have expressly distinguished that case on this basis, concluding that even questionnaires – that reflect the questions asked and the answer given – are not discoverable absent a showing of substantial need. *See Friends of Hope Valley v. Frederick Co.*, 268 F.R.D. 643 (E.D.Cal. 2010). Plaintiffs have cited no case requiring the production of any draft affidavit or other communication with third parties in the absence of a showing of "substantial need."

## 4. *Communications With Navigant Consulting*

The parties have a disagreement concerning the production of plaintiffs' communications with Navigant Consulting. Sanofi believes that plaintiffs must either produce their pre-Complaint communications with Navigant Consulting or identify them on a privilege log. Plaintiffs believe that their communications with consulting experts are protected from discovery, and if such documents are to be included on a log, that all such communications should be logged, regardless of whether such communications are pre- or post-filing. The parties have discussed this issue extensively, in multiple letters between counsel for the parties and during the meet-and-confer teleconferences.

**Sanofi's Position:**

The documents concerning plaintiffs' communications with Navigant are different from communications with ordinary consulting experts. Navigant is not just an expert consultant, it is _witness_ to the close coordination between plaintiffs' counsel, Novartis, AAI, CREW, and the named plaintiffs. This coordination is highly relevant to whether plaintiffs are being used – to use plaintiffs' counsel's own words – as a "stalking horse" for Novartis, which would likely lack standing to bring its own case. If so, this information would significantly impair Novartis' credibility as a witness, as well as the named plaintiffs' own credibility, since at least one of the named plaintiffs is a loyal Novartis customer, who Novartis presumably helped to identify.[22]

---

[22] The Navigant documents Sanofi seeks are fundamentally different from the declarations and other counsel-communications discussed above. Sanofi is not seeking information that is

29

**Proskauer>>**

    We are just beginning to understand the orchestrated nature of the scheme devised by Novartis and plaintiffs' counsel, since – at this point – we have little more than the public record to go by.  But even this limited record reveals some troubling facts, which ***plaintiffs do not deny***.[23]

    To understand why, some context is necessary.  It is well-settled that the antitrust laws were not designed to protect competitors from competition.  Thus, when competitors complain about the conduct of their rivals, such complaints are typically shrugged off by courts and regulators as, at best, "sour grapes" or, at worst, as an attempt to use the antitrust laws as a club to *impede* competition.  Recognizing this, competitors often try to find a more sympathetic party to be the standard bearer for their cause.  That is exactly what Novartis, working in conjunction with plaintiffs' ***counsel of record in this case*** and a number of supposedly independent non-profit organizations plaintiffs' counsel controls, appears to have done.

    What we know from the public record is this:  Within months of entering the pediatric vaccine market with its Menveo vaccine, Novartis devised a strategy to challenge Sanofi's contracting practices in court or before the Federal Trade Commission, rather than in the marketplace.  Novartis then retained two antitrust experts, Kevin Caves and Hal Singer, from Navigant Consulting to prepare a report for the express purpose of disparaging Sanofi, its PBG contracts, and its pricing in order to build a case that could be presented to the FTC.  We do not yet know whether Novartis was still acting alone, or whether it had brought plaintiffs into its scheme from inception.  But the latter seems probable.  Hal Singer is not only one of the usual

---

available from other vaccine market participants.   It is seeking contemporaneous evidence from Navigant ***as a witness*** to the scheme plaintiffs' counsel and Novartis hatched to inflict injury (and collect money) from Sanofi.  Thus, Sanofi has a "substantial need" for this evidence.  See Fed.R.Civ.P,. 26(b)(3)(A).  Plaintiffs do not claim otherwise.

[23] Because plaintiffs have not produced all relevant information, the statements should be viewed in the nature of allegations made on information and belief based primarily on publicly available information and reasonable inferences drawn therefrom.  Notably, other than generally characterizing Sanofi's description of events as "baseless and scurrilous," plaintiffs do not actually deny any ***specific*** operative fact.  We fail to see how plaintiffs can describe the allegations as baseless or scurrilous in a ***representation to the Court***, since the (i) the facts have been are drawn from the public record, (ii) plaintiffs have not specifically denied any operative fact, and (iii) plaintiffs failed to respond to Sanofi's request for additional information.  *See* Ex. 10.  In any event, this is an issue that can be addressed once the sun is permitted to shine on these events.

suspects that plaintiffs' counsel use in bundling cases, he was specifically retained by **_plaintiffs'_** **_attorneys of record in this case_** as part of the *current* litigation.[24]

Hiring an expert antitrust economist was only the first step for Novartis. Knowing that Novartis could not legitimately claim foreclosure (given its successful entry), it decided not to pursue its own complaint. Instead, even before the Navigant report was made public, an advocacy group called Citizens for Responsibility and Ethics in Washington ("CREW") sent a letter to the FTC asking it to investigate Sanofi.

This is curious for several reasons. *First*, the subject matter of the CREW letter – vaccines, medical health, and competition – has **_nothing_** to do with CREW's mission of promoting ethical government and politics.[25] *Second*, the CREW letter was filed before Navigant's report was made public, and before there was any media attention given to Sanofi's contracting practices. How did CREW learn about this? How did it decide to embrace this issue and serve as undisclosed spokesperson for Novartis? We do not know. Even though CREW claims to be in favor of "disclosure" and committed to "ethics and responsibility," it refuses to disclose its donor list. An exposé on CREW's impartiality, however, revealed that Daniel Berger, a managing shareholder of the Berger & Montague firm that has been appointed **_lead counsel in this case_**, is a founding director and board member of CREW.[26] Plaintiffs have now also admitted that "some of Plaintiffs' counsel (or lawyers in their firms…) have preexisting relationships" with CREW.[27]

---

[24] Publicly reported cases where **_plaintiffs' counsel of record in this case_** retained Hal Singer include: *Behrend v. Comcast Corp.*, 626 F. Supp. 2d 495 (E.D.Pa. 2009); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l., Ltd.*, 262 F.R.D. 58 (D.Mass. 2008); and *Johnson v. Arizona Hosp. and Healthcare Ass'n*, 2009 WL 5031334 (D.Ariz. 2009). The Navigant report funded by Novartis relies on an article by Einer Elhauge, another lawyer-economist expert that the **_plaintiffs' attorneys of record in this case_** routinely use in bundling cases. *See Natchitoches Parish Hosp. Serv. Dist. V. Tyco Int'l, Ltd.*, 2009 WL 4061631, at *8 (D.Mass 2009).

[25] *See* http://en.wikipedia.org/wiki/Citizens_for_Responsibility_and_Ethics_in_Washington; and http://www.citizensforethics.org/pages/mission.

[26] http://activistcash.com/citizens_for_responsibility_and_ethics_in_washington_CREW/who.htm

[27] Plaintiffs note that Mr. Berger resigned as a CREW board member in January 2011. But the CREW letter was submitted on July 6, 2010. Moreover, if it is true that, as plaintiffs claim, Mr. Berger "has no knowledge of, involvement with, or documents relating to the letter written by CREW" plaintiffs have not made the same representation as to the other plaintiffs' counsel (or lawyers in their firms), who also had a preexisting relationship with CREW. Nor, as Sanofi has done, have plaintiffs offered affidavits in support of their factual assertions.

![Proskauer logo]

But this was only the first step in a broader scheme because CREW's initial attempt to prompt significant interest by the FTC was wholly unsuccessful. The next step was to recruit a different advocacy group; one that has *some* purported connection to antitrust and competition. That group was American Antitrust Institute, whose board is **dominated** by the **plaintiffs' attorneys of record in this case**. For example, **lead class counsel** Eric Cramer (also from Berger & Montague) is a senior fellow with AAI and a member of its advisory board, and **lead class counsel**, Linda Nussbaum, is also on AAI's advisory board. Other class counsel (all from different firms) are also on AAI's advisory board, including Joshua Davis, David Balto, Anthony Bolognese, and Steve Shadowen. As with CREW, we do not know when AAI decided to pursue this issue, whether they coordinated with Novartis, or whether, by this time, plaintiffs' counsel had already hatched a plan to use AAI and/or CREW as part of their effort to build support for their litigation.[28]

Nonetheless, plaintiffs' counsel, exercising their position of authority as members of AAI's advisory board, convinced AAI to make another run at the FTC. The reason was obvious – if they were successful in getting the FTC to investigate – plaintiffs' counsel would need to devote less of their own resources and money into litigating this case.

But there was a problem. AAI had nothing of substance to add. So what did they do? Someone instructed Navigant to take the unusual step of publishing its report and placing it on the public record. This would give AAI some "facts" and "analysis" – "facts" and "analysis" sponsored by Novartis – that they could present to the FTC.[29] **Plaintiffs' counsel of record in**

---

[28] While Plaintiffs' counsel have agreed to produce information relating to their communications with AAI, CREW, and Novartis, they have **not produced** any such documents relating to the pre-filing stage of the case. It is unclear whether this reflects the absence of such communications, whether such communications were conducted orally (as some post-complaint communications were), or whether plaintiffs are playing the "different hats" game, producing documents only when specific attorneys of record were acting in the capacity of litigation counsel versus as officials and members of their "non-profit" organizations. The latter seems a distinct possibility since (i) they have not denied that that they are playing this game, and (ii) they appear not to have produced any documents from the files of Daniel Berger or any of other (unnamed) "Plaintiffs' counsel (or lawyers in their firms…) [that] have pre-existing relationships" with CREW and AAI. Of course, Sanofi's ability to determine the reasons for the lack of such information is limited, as plaintiffs failed to produce any custodian information or metadata relating to such communications, even though it was requested and clearly exists. Nor have plaintiffs' counsel yet produced telephone records relating to such communications. Sanofi intends to raise these and other deficiencies with plaintiffs' recent production in the upcoming days.

[29] Notably, even though AAI relied on the Novartis funded expert report, AAI did not disclose Novartis' role to the FTC. To the extent plaintiffs' counsel (in their capacity as potential

32

Proskauer >>

*this case* then retained Navigant as a "consulting expert" in the hopes that they could shield any discussions with Navigant under a cloak of privilege, as they now seek to do.[30]

Having done this, AAI then submitted a letter to the FTC, relying on the work that Navigant had performed at Novartis' expense and under its direction. But this was not the end of the plan; it was just the beginning. Regardless of whether Novartis and the advocacy groups controlled by plaintiffs' counsel were successful in getting the FTC to sue, the end game for plaintiffs' counsel was not an FTC investigation, it was money. From the beginning of the scheme, plaintiffs' counsel were gearing up to file a massive class action.

But plaintiffs' counsel faced a second problem. They needed to identify someone to serve as a named plaintiff. Again, it appears that Novartis came to plaintiffs' counsels' rescue. The person plaintiffs' counsel initially identified was a *single* named plaintiff – Adriana M. Castro – who, at least according to Sanofi's records, had ***not ordered a single dose*** of Menactra since January 2010, one month ***before*** Novartis' launch of Menveo. Documents Adriana Castro has since produced also show that she has bought Novartis' Menveo since its launch. Thus, the person plaintiffs' counsel *initially* chose to represent the class was a *loyal Novartis customer* and one that Novartis likely helped to identify.

Why is all of this relevant? Two reasons. *First*, as Sanofi explained in its Counterclaim, Sanofi's discounts significantly benefit physicians and healthcare providers by substantially increasing their incomes and profit margins. CC ¶ 1. Thus, Sanofi's customers are unlikely to sue unless they are acting at the "behest of plaintiffs' attorneys" and perhaps Novartis. *Id*. This fact alone casts doubt on Castro's credibility, and makes the circumstances of her involvement – and plaintiffs' counsel's coordination with Novartis, AAI, CREW, and Navigant – highly relevant.

*Second*, and *more importantly*, Novartis is a key third-party witness in this case. Novartis is the supposedly "foreclosed" competitor, notwithstanding its steady increase in market share over the past two years. As such, Novartis has a direct and substantial interest in the outcome of

---

litigation counsel or as members of AAI's advisory board) were also working directly with Novartis and/or Navigant behind the scenes, this too was undisclosed to the FTC.

[30] The timing of plaintiffs' retention of Navigant is not clear, as plaintiffs have not disclosed this information. Plaintiffs, however, have admitted that they retained Navigant well in advance of filing the lawsuit. Since the lawsuit was filed in December 2011, AAI's letter to the FTC was filed in November 2011, and the Navigant report was published just a few months earlier in August 2011, it is likely that Navigant was retained by plaintiffs while Navigant was still finalizing the Novartis-funded report. If so, this would make Navigant a jointly-retained expert both for purposes of litigation and/or public relations, requiring the production (not just logging) of all such documents.

![Proskauer>>]

this case. Not only will any damages award inflict injury on Sanofi, but it may limit Sanofi's willingness to continue aggressively discounting its products, creating an umbrella for Novartis to raise prices. This gives Novartis every incentive to exaggerate any potential injury and minimize its competitive victories. That Novartis has played an instrumental role in triggering this lawsuit, including potentially partially funding plaintiffs' expert and identifying a named plaintiff that plaintiffs' counsel could use (in plaintiffs' words) as a "stalking horse" is highly relevant to Novartis's bias.[31]

Despite the relevance of this information, plaintiffs have refused to produce documents relating to communications with Navigant, seeking to cloak their communications with Navigant under the guise of privilege. In doing so, plaintiffs rely not on the text of Rule 26(b)(4), but on some divined legislative intent behind it.[32]

But Rule 26(b)(4) protects only "***facts known or opinions held***" by a consulting expert. It does not protect the timing of communication, or the identity of the individuals involved in crafting a litigation scheme. Indeed, Sanofi is not seeking information about the "facts known or opinions held" by Navigant following plaintiffs' retention of Navigant as an expert (except potentially where Novartis's involvement may waive privilege). Sanofi is fundamentally interested in the relationship between Novartis, Navigant, plaintiffs' counsel, AAI, and CREW. This is not information protected by the rule. As the Advisory Committee make clear, this Rule

---

[31] Evidence relating to Novartis' involvement with plaintiffs' counsel is also relevant to whether Novartis went one step further, not only coordinating this lawsuit but whether it actively pulled its competitive punches in order to make plaintiffs' claim seem stronger than it really is. At this point, without discovery, we don't know the answer. But it should be noted that Novartis immediately _raised the price_ of Menveo in May 2010 **by 15%** after its market share increased too quickly from almost zero percent in February (the first month of its launch) to 20% by the end of April. Rather than continuing this highly *successful and profitable* price promotion, Novartis **sacrificed** substantial market share (with its share dropping from almost 20% down to 5% within one month) by not extending or making permanent its initial price promotion. The only logical explanation for this is that Novartis did not *want* to grow its market. Notably, this is inconsistent with plaintiffs' allegation that Novartis' decline in market share in May of 2010 was due to Sanofi's alleged "more aggressive enforcement" of its PBG contracts. Plaintiffs, of course, neither cite any document between April and May supporting this contention nor disclose Novartis' decision to end its initial promotion. Having shared an expert with Novartis – and presumably having had discussions with them – plaintiffs should have known this, and if so, were *obligated* to disclose it, rather than present a false picture of the facts.

[32] Plaintiffs argue that they should not be obligated to log the communications with Navigant because all communications are clearly protected. But as explained herein, that is not so. A log is required so that Sanofi can determine *whether* certain communications are privileged, and can challenge the claim on a document-by-document basis if necessary.

**Proskauer>>**

"does not address itself to the expert whose information was not acquired in preparation for trial *but rather because he was an actor or viewer* with respect to transactions or occurrences that are part of the subject matter of the lawsuit." *See* Fed.R.Civ.P. 26, *1970 Advisory Cmtee Notes*. Put simply, Sanofi seeks information to the extent Navigant is an actor or viewer in the plan embarked upon by Novartis and plaintiffs' counsel to use AAI, CREW, and Dr. Castro as – use plaintiffs' words – "stalking horses" to inflict competitive injury on Sanofi for Novartis's benefit and to generate a big payday for plaintiffs' counsel.[33]

In the alternative, plaintiffs argue that it would be unfair to require them to produce (or log) their pre-complaint communications with Navigant because Sanofi likely does not have any similar communications. This argument is frivolous. Plaintiffs' discovery obligations do not turn on whether Sanofi has similar documents, or even a similar burden. Moreover, if one were to compare discovery burdens, it is clear that Sanofi's burden far outstrips the burden plaintiffs have gone through in producing a mere two boxes of documents.

Next, plaintiffs argue that Sanofi either does not need additional evidence – because some facts are already in the public record – or if it does, then it should seek them from other third-parties, such as Novartis, AAI, CREW, etc. These arguments are meritless. Sanofi has already identified numerous facts that are not publicly available and remain hidden behind the cloak of darkness. Indeed, to shed light on just some of these issues, Sanofi requested that plaintiffs answer questions directly related to these events. *See* Ex. 10 (Oct. 17 Ltr. from Kass to Walker). Plaintiffs failed to respond. Nor is Sanofi seeking discovery from third-parties a substitute for seeking party discovery. While Sanofi is already seeking discovery of these events from Novartis (and plans to subpoena AAI and CREW), not all of the schemers were necessarily involved in every communication. For example, while plaintiffs assert that Sanofi can ask Ms. Castro whether Novartis helped plaintiffs to identify her, Ms. Castro may not know. What if Novartis gave plaintiffs' counsel her number, rather than made a specific face-to-face introduction? Plaintiffs

---

[33] The information Sanofi seeks here is different in kind from the affidavits plaintiffs seek from Sanofi. Plaintiffs' counsels' communications with Novartis, AAI, CREW and related entities do not constitute "trial preparation" materials. Sanofi, for example, is not seeking signed declarations or even draft declarations. Nor is it seeking to discover "facts" developed by plaintiffs' counsel, or insights into their "legal theories." Indeed, it is unlikely that AAI or CREW would even have such facts or insights, since they are not participants in any of the alleged relevant markets. Rather, Sanofi seeks information concerning the relationships between and among these entities, including whether plaintiffs' counsel and Novartis hatched a plan to use AAI, Dr. Castro, and others as "stalking horses." This information is not privileged, and is highly relevant to bias and witness credibility.

**Proskauer»**

would know the answer, Navigant may have been involved in meetings where this was discussed, but Ms. Castro may be none the wiser.[34]

Plaintiffs do not deny this. Instead, consistent with their litigation themes, they posit an alternative story: That Ms. Castro decided to sue Sanofi because Menveo, which Ms. Castro loyally purchased from Novartis, is allegedly a better product. Not only is this nonsensical -- since it does not explain why Ms. Castro would have wanted to sue Sanofi or how plaintiffs' counsel was able to identify Ms. Castro or solicit her participation – but plaintiffs' protestations of Ms. Castro's pure motives create exactly the type of fact dispute that warrants discovery. Plaintiffs simply cannot be permitted advance their (unsupported) version of events without giving Sanofi an opportunity to obtain access to the contemporaneous documents that would disprove it.

Finally, plaintiffs seek to try to dissuade Sanofi from seeking this information by asking this Court to create an environment of mutually-assured destruction, claiming that they will only log their pre-complaint communications with Navigant if both parties log all communications with their expert consultants for the life of the case.

Plaintiffs' "life of case" proposal is orders of magnitude more intrusive (to use their words) than Sanofi's limited pre-Complaint logging proposal. More importantly, plaintiffs know that such a "life of case" requirement is not only unprecedented in the annals of litigation, it is inherently unworkable. Indeed, plaintiffs' demand is ironic, since they are the ones that (prior to this issue arising) requested an "expert" stipulation that would give the parties *expanded* flexibility to work with both testifying and non-testifying experts. *See* Ex. 7 (Sept. 24 email from Kass to Walker). Plaintiffs' attempt to torpedo their own proposal to enhance efficiency in order to protect their pre-complaint coordination with Novartis's expert should not be countenanced.[35]

---

[34] Plaintiffs' position also contradicts Rule 45(c)(1), which requires an "attorney responsible for issuing and serving a subpoena [to] take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed.R.Civ.P. 45(c)(1). To the extent such information exists, Sanofi is obligated to seek it from plaintiffs. Moreover, nothing in that rule or the Federal Rules suggests that a party whose access to discovery is not burdensome – one presumes plaintiffs have isolated most of the relevant documents by now – may foist that burden onto a non-party.

[35] Plaintiffs acknowledge that their current demand for life-of-case logging is inconsistent with their proposal for an expert stipulation. Instead, they seek to justify jettisoning their proposal – not as an effort to cloak pre-filing communications – but to "be fair to both parties." Plaintiffs' position is not credible.

36

Proskauer»

Accordingly, Sanofi requests that the Court not *tie* plaintiffs' pre-Complaint logging requirements to the parties' post-Complaint logging requirements. Instead, the Court should order plaintiffs to produce or log their pre-complaint communications with Navigant, and leave the parties to continue their discussions concerning future communications with their respective experts.

This approach makes eminent sense, and is dictated both by the relevance and the different levels of protection afforded to the information. Prior to plaintiffs' retention of Navigant, there can be no arguable privilege. Following the retention, but prior to the filing of the suit, Navigant is both an "actor and viewer" with respect to the relationships involved and, perhaps, a true consulting expert in terms of providing or formulating facts or opinions in anticipation of trial. Because the former is not privileged and the latter is, a log is required in order to determine which documents fall within each category. Finally, following the filing of the suit, it is likely that the case has started to run its own course, and thus, Navigant is more likely to be playing the role of a traditional consulting expert. Thus, the usual post-litigation logging rules should apply.[36]

**Plaintiffs' Position:**

Sanofi's request—that the parties should be required to log or produce *pre-filing* communications with consulting experts—is obviously one-sided, given the likelihood that (as it is with defendants in nearly every case) Sanofi never consulted an expert prior to receiving notice of the lawsuit. Moreover, Sanofi's proposal is intrusive, and unnecessarily so, in that it asks Plaintiffs to log (or produce) communications that are clearly protected from discovery by Rule 26 and the work-product doctrine.

As an initial matter, Plaintiffs engaged an expert economist, Dr. Hal Singer and members of his staff, to discuss substantive economic issues prior to, and in connection with, filing the initial complaint in this case, and have continued to consult Dr. Singer on various economic issues related to this case. The communications with Dr. Singer, which contain Plaintiffs' counsel's mental impressions of the case and Dr. Singer's consulting expert opinions on issues related to Plaintiffs' claims, are protected under the work-product doctrine and Rule 26(b)(4)(D). *See, e.g.*, *In re Cendant Corp. Secs. Litig.*, 343 F.3d 658, 665 ("In *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587 (3d Cir. 1984), we held attorney opinion work product shown to experts in an antitrust case was not discoverable."). Indeed, the law is clear that counsel's ordinary (*i.e.*, non-

---

[36] A log is also necessary because, if the evidence shows that Navigant was jointly retained by Novartis and plaintiffs' counsel, any privilege would have been waived, since Navigant is not a litigant. A log is also necessary because it will reveal the dates and times of communications, which will also contribute to an understanding of the timeline from the scheme's inception to the filing of the Complaint.

opinion) trial preparation materials are only discoverable if Sanofi "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3). On the other hand, "core or opinion work product receives greater protection than ordinary work product and is discoverable only upon a showing of rare and exceptional circumstances." *Cendant*, 343 F.3d at 663.

Sanofi does not argue that it is entitled to communications between Plaintiffs' counsel and Navigant that discuss or contain either Plaintiffs' counsel mental impressions of the case or "facts known or opinions held" by Navigant related to the case. Instead, faced with the fact that there is no good reason to impose a discovery requirement on Plaintiffs that is both disproportionate and unnecessary, Sanofi attempts to justify its proposal by spinning a far-fetched, irrelevant, and baseless tale of a conspiracy involving Plaintiffs' counsel, Novartis, various non-profit groups, physicians, and expert economists, hoping to convince the Court that it should be given a one-sided right to poke around in Plaintiffs' pre-complaint investigation work product. That is, Sanofi essentially argues that it believes, based on no evidence, that Navigant is a "fact witness" with knowledge of its purported grand conspiracy relating not to the merits of Plaintiffs' claims or Sanofi's counterclaim, but rather to Plaintiffs' counsel's pre-complaint investigation of this case. *Supra* at 34-35.

Sanofi's theory about the origins and motivations behind this case is baseless, illogical, and irrelevant to any claim, defense or other issue in this case. Nevertheless, in the spirit of full disclosure, Plaintiffs offered Sanofi a compromise: Plaintiffs would log their communications with Navigant as long as Sanofi's counsel agrees to log all of its communications and documents relating to its own litigation and economic consultants. Sanofi rejected the offer, insisting instead that only pre-suit communications be logged, which, of course, is completely one-sided, only affecting Plaintiffs' counsel's investigation of its claims, and not Sanofi's. The one-sided nature of Sanofi's proposal is all the more absurd in light of Sanofi's counsel's refusal to produce its own communications, not only with its consultants, but also with third parties it concedes are fact witnesses—on the ground of its need to shield its own work product from discovery! That is, Sanofi argues that its counsel need not produce its communications, including signed declarations that will be used for impeachment, with third party fact witnesses that contain factual matter directly relevant to this lawsuit, but that Plaintiffs' counsel should somehow be obligated to produce its communications with a consulting expert because those are—allegedly—relevant to a far-fetched conspiracy theory. Sanofi's proposal should be rejected.

Having rejected Plaintiffs' fair proposed compromise, Sanofi instead seeks to justify its absurd and one-sided proposal through its rambling, baseless conspiracy theory. Unfortunately, the Court must wade through several pages of this quixotic rant before getting to the central question: Why is Sanofi's theory relevant? The answer, of course, is that it is not relevant at all. Nevertheless, Sanofi offers two purported justifications for its proposal.

*First*, Sanofi illogically asserts that communications between Plaintiffs' counsel and Navigant *might* somehow show that one of the named Plaintiffs is acting at the behest of Novartis and/or Plaintiffs' counsel. But Sanofi's *only* purported evidence supporting this theory is that Dr. Castro must have been a Novartis loyalist all along because her practice purchased

**Proskauer»**

Menveo, Novartis's meningitis vaccine, shortly after it became available for purchase. *Supra* at 33. Perhaps a more logical conclusion is that Dr. Castro was swayed by Menveo's better efficacy data, or that she was tired of being taken advantage of by a monopolist (Sanofi) for years. In any event, it is safe to say that Sanofi has no evidence that Dr. Castro is suing at Novartis's behest because there could be no such evidence. Dr. Castro is not suing at anyone's behest but her own. In any event, if Sanofi wants to know why Dr. Castro has sued it, Sanofi need not engage in extraordinary discovery. Sanofi can simply ask her at her deposition.

*Second*, Sanofi argues that it should be entitled to discovery of communications between Plaintiffs' counsel and Navigant because Sanofi apparently believes that such discovery will somehow reveal a connection between Novartis and Plaintiffs' counsel with respect to this litigation. This theory appears to be based solely on the fact that Navigant performed a study of Sanofi's vaccines bundling scheme that was partially funded by Novartis (a fact disclosed in Navigant's published article). But what does Sanofi hope to show? That Novartis is biased because it would like to see Sanofi's illegal monopoly bundling practices that have impaired Novartis's ability to sell its vaccines be stopped? How could a foreclosed competitor be disinterested?

In any event, Sanofi's far-fetched tale is not relevant to any of the issues in this case: whether Sanofi violated the antitrust laws; whether Plaintiffs were injured and suffered damages; or, with respect to the Counterclaim, whether Plaintiffs and the PBGs formed an illegal buyer's cartel. It is entirely irrelevant that Plaintiffs' counsel have previously worked with Dr. Singer; that some of Plaintiffs' counsel (or lawyers in their firms but not working on the case) have preexisting relationships with legal advocacy groups, such as the American Antitrust Institute ("AAI") or Citizens for Responsibility and Ethics in Washington ("CREW") that are concerned with anticompetitive activity such as Sanofi's bundling;[37] or whether Novartis is also motivated to take action against Sanofi for Sanofi's anticompetitive behavior. In any case, as Sanofi concedes, all of these points are in the public record, including Dr. Singer's disclosure in his published article discussing Sanofi's bundling practices that his research was supported in part by Novartis.

Moreover, Sanofi asserts that discovering, through the use of a privilege log, when Plaintiffs' lawyers communicated with their consulting experts will somehow enable Sanofi to impeach the credibility of Novartis (a third party) and one of the named Plaintiffs. Yet the point Sanofi seems to want to make—*i.e.*, that Novartis (a foreclosed competitor) and one of the

---

[37] Daniel Berger, a managing shareholder of Berger & Montague, resigned as a board member of CREW in January 2011 and was inactive for most of 2010. He has no knowledge of, involvement with, or documents relating to the letter written by CREW regarding Sanofi's anticompetitive practices. But, of course, none of that is relevant in any way to the claims in this case.

Proskauer≫

named Plaintiffs both have an interest in seeking to stop Sanofi's bundling practices and have Sanofi pay for the harm it caused—is hardly a point that requires any discovery, let alone unorthodox discovery.[38]

Further, to the extent Sanofi is genuinely seeking the truth, it can attempt to get all of this almost entirely irrelevant information through the ordinary discovery procedures directed at the third parties at issue or the named Plaintiffs. For example, if Sanofi wants to discover whether CREW was, in fact, Novartis's "undisclosed spokesperson," what is stopping Sanofi from getting that information from Novartis or CREW through the use of subpoenas? Likewise, and again, Sanofi is free to ask Plaintiff Castro at deposition whether, in fact, Novartis "helped to identify" her to Plaintiffs' counsel, as Sanofi baselessly and irrelevantly speculates. *See infra* at 33. But Sanofi never says why these other methods of discovery are inadequate, or why requiring Plaintiffs to log pre-suit communications with their consulting expert detailing Plaintiffs' counsel's substantive investigation of the claims in this case will somehow help Sanofi in its quixotic pursuit of this irrelevant information. Regardless, in order to try and reach a compromise, Plaintiffs were nonetheless willing to log ***all*** communications with Navigant, in return for an even-handed rule that would require the logging of all communications between counsel for all parties and all litigation consultants or other experts engaged in this matter, regardless of whether pre- or post-filing.[39]

Finally, as discussed above, without conceding their relevance but in the vain hope of showing Sanofi's counsel that it is chasing a unicorn, Plaintiffs already produced a handful of documents (to the extent there were any) reflecting communications between Plaintiffs' counsel and the third parties (CREW, AAI, and/or Novartis) that Sanofi weaves into its fanciful theory, imposing no date restriction on that production. Obviously, if Sanofi believed that these documents that Plaintiffs have already produced supported its theory, it would have introduced

---

[38] Sanofi's assertion in footnote 22 that this lawsuit is a "scheme plaintiffs' counsel and Novartis hatched to inflict injury (and collect money) from Sanofi" is wrong and, more importantly, nonsensical, given that the so-called "scheme" involves the assertion of Plaintiffs' rightful claims under the U.S. antitrust laws, which have been upheld over Sanofi's motion to dismiss. Even if Plaintiffs' counsel were somehow motivated by a desire to help Novartis—as opposed to ending anticompetitive conduct and recovering for injuries to their clients—that would still be entirely irrelevant to the merits of the claims in this lawsuit.

[39] Sanofi incorrectly asserts that Plaintiffs' proposal is somehow at odds with Plaintiffs' proposal that the parties enter into a stipulation that would limit discovery between experts. Indeed, to be clear, Plaintiffs would prefer that discovery be limited with respect to both consultant and testifying experts, particularly with respect to communications among counsel and their retained experts. (Such stipulations are common in litigation.) It is *Sanofi* that is pushing for discovery of expert communications and clear work product, and Plaintiffs' position is merely that any requirement to log expert communications that are withheld from production be even handed.

**Proskauer>>**

that evidence into this joint discovery letter. But the documents actually produced (and, the very fact that so few exist) refute Sanofi's theory, so Sanofi is now attempting to dig further by asking the Court to impose a one-side requirement that Plaintiffs log their pre-Complaint communications with consulting experts—documents that are obvious work product.

In sum, Plaintiffs have acted more than reasonably, attempting to spare this Court an unnecessary discovery dispute: they have produced communications between Plaintiffs' counsel and various third parties in the hope of bringing this detour to an end, despite Sanofi's refusal to do the same; and they have offered to log communications between Plaintiffs' counsel and their consultants, as long as the rule does not draw arbitrary and unfair distinctions in Sanofi's favor.

**5.**     *Sanofi's RFP No. 29*

Sanofi's RFP No. 29 seeks "All documents concerning the costs of purchasing Relevant Vaccines, including all documents relating to the effect of such costs on Your cash flows, revenues, or profits." Plaintiffs objected to this request on the grounds, *inter alia*, that this request seeks "downstream" discovery related to Plaintiffs' sales to customers. Ex. 11 (Pls.' Obj. and Resp. to Sanofi's First RFPs), at 23. The parties have conferred extensively on this topic, including by letter and in the September 6 meet-and-confer teleconference, but the parties remain at an impasse.

**Sanofi's Position:**

Plaintiffs do not and cannot make any burden claim to justify withholding evidence relating to the impact of the vaccine costs on the named plaintiffs' business. Their only argument is relevance. In support of this argument plaintiffs now – ironically – abandon the "reasonably calculated to lead to admissible evidence" standard that they (wrongly) espoused above, and now revert to the "claims and defenses"/"good cause" standard they previously ignored.

Regardless of the standard, however, the evidence Sanofi seeks is plainly discoverable. In their Complaint, plaintiffs allege that "[p]aying Sanofi's penalty prices would put physicians and hospital purchasers at a severe disadvantage because they, in turn, could not offer pediatric vaccines at commercially viable prices." Cmplt. ¶ 123. Addressing this allegation, Sanofi sought documents that show the impact of vaccines costs on plaintiffs' cash flows, revenues, and profits, in order to determine the impact of vaccines on plaintiffs ability to compete in the patient market. *See* Ex. 11 (RFP No. 29).

Such information is relevant for at least three reasons. *First*, it is relevant to the demand for pediatric vaccines, which derives from patients' and their parents' demand for pediatric inoculations. *Second*, to the extent there is *no* connection between costs and plaintiffs' profits and ability to compete, the information would rebut the "anticompetitive effects" picture that plaintiffs are trying to paint. *Third*, to the extent there *is* a connection, the information would be relevant to Sanofi's Counterclaim, as it goes to whether PBGs have the power to effectively enforce their cartels against cheating members.

41

**Proskauer**

With respect to the defense of plaintiffs' affirmative claim, plaintiffs acknowledge that the information Sanofi seeks is relevant to the allegation made in paragraph 123 of the Complaint. They claim, however, that plaintiffs' *own* allegation is not relevant to their *own* "claims or defenses," and thus, such discovery does not fall within Rule 26(b)(1). In addition, they assert that, because this was just a stray allegation, they have not "opened the door" to such discovery.

Plaintiffs are wrong on both fronts. As to their Rule 26(b)(1) argument, the focus is on whether the information sought is relevant to the *requesting party's* claims or defenses. Thus, the inquiry is whether the information is relevant to Sanofi's *defense* of plaintiffs' claims. A party cannot make allegations in their own complaint and then refuse to allow the opposing party discovery into those allegations in order to rebut them. ***Here, plaintiffs have not disclaimed their intent to introduce any evidence (including testimonial evidence by experts or fact witnesses) concerning the importance of vaccines to pediatricians' practices.*** Thus, plaintiffs cannot rely on Rule 26(b)(1) to foreclose discovery. Nor can plaintiffs argue that a mere allegation in a complaint is insufficient to open the door to discovery. *See Air Tech Equip., Ltd. v. Humidity Ventilation Sys., Inc.*, 2006 WL 3193720, at *2 (E.D.N.Y. 2006) (ordering downstream discovery where counterclaim plaintiff alleged that counterclaim defendant "hampered [counterclaim plaintiffs] from growing and profiting from their business in the relevant market of alternative dehumidifiers.").[40]

Plaintiffs also do not deny that this discovery is relevant to the Counterclaim. As the Counterclaim alleges, PBGs typically require their members to agree to purchase their vaccines predominately or exclusively through the PBG, as a way to maximize their collective market power. *See* CC (dkt. 111), ¶ 72-74. But to maximize their power, every buyers' cartel needs a mechanism to prevent its members from "cheating." The PBGs here do this, in part, by being able to delist members that purchase off-contract, thus, terminating their right to purchase at the PBG-negotiated discounted price. *Id*. To the extent being a member of a PBG significantly impacts the physician's profitability and ability to compete in the patient market, delisting a member may be an effective mechanism to police the cartel. Thus, information concerning the impact of vaccine costs on physician's revenues, cashflows, and profitability, and its ability to compete in the patient market, goes directly to whether PBGs are able to effectively enforce the cartels alleged in the Counterclaim.

In response, plaintiffs cite inapposite cases concerning "downstream discovery" where the sole purpose of the information is to mount a "*pass-on*" defense in *mitigation* of damages.

---

[40] Thus, to the extent the Court denies Sanofi's request, Sanofi respectfully asks the Court to issue an order of preclusion regarding any evidence plaintiffs or their experts would otherwise offer regarding injury or damages to vaccine purchasers' ability to compete in downstream markets.

**Proskauer >>**

These courts have largely denied downstream discovery in those cases because, under the federal antitrust laws, there is no pass-on defense, and thus no need for such discovery. Most courts, however, have recognized that evidence concerning downstream competition in antitrust cases can be important, and thus discoverable, where relevant for other reasons. *In re Urethane Antitrust Litig.*, 2011 WL 1327988 (D.Kan. 2011) (downstream discovery permissible if relevant to issue in the case other than the non-existent pass-on defense under federal law); *Air Tech Equip., Ltd.*, 2006 WL 3193720; *In re Wellbutrin XL Antitrust Litig.*,, 268 F.R.D. 539, 543 (E.D.Pa. 2010) (noting prior order where court ordered discovery because it was "relevant regardless of whether it was 'downstream' discovery.").

As noted above, Sanofi is not seeking information concerning plaintiffs' profits or competition for purposes of mounting a pass-on defense. Thus, the information is fully discoverable. Nor do plaintiffs argue that such information is too burdensome to produce. To date, they have produced a mere two boxes of documents. Supplementing their production with the requested information should not pose a problem.

**Plaintiffs' Position:**

Plaintiffs produced all documents—generally, invoices—showing their purchases of relevant vaccines. Sanofi now seeks discovery as to Plaintiffs' "downstream" sales of vaccines to customers (*i.e.*, patients), but the only basis Sanofi asserts for seeking this discovery is that the Complaint alleges "that '[p]aying Sanofi's penalty prices would put physician and hospital purchasers at a severe disadvantage because they, in turn, could not offer pediatric vaccines at commercially viable prices,'" Ex. 5, at 7 (quoting Compl. ¶ 123), and thus that "plaintiffs have opened the door to discovery as to its truth or falsity," *id.* The lone allegation cited by Sanofi does not justify this burdensome and irrelevant discovery.[41]

As an initial matter, the mere fact that Plaintiffs include that allegation in the Complaint does not justify this expansive discovery. As Sanofi itself asserts, "it is not true that [a party is] entitled to discovery relating to every allegation in the Complaint or Counterclaim, irrespective of whether that allegation bears on any claim or defense at issue." Ex. 2, at 1. Indeed, Sanofi notes that Rule 26(b) itself distinguishes between discovery "relevant to the claims or defenses," which is broad, and discovery relevant merely "to the subject matter involved in the action," which can only be ordered for good cause. Ex. 2, at 1. While Sanofi incorrectly applies these principles in its August 28 Letter (Ex. 2), the principle is correct that mere allegations do not necessarily "open the door" to discovery.

---

[41] Notably, Sanofi has chosen to represent that it seeks only Plaintiffs' profitability information, and not the broader swath of information covered by its request. Thus, even if Sanofi's request is allowed—and it shouldn't be—it should be narrowly limited only to information related to profitability.

43

**Proskauer**≫

Moreover, the allegation at issue is not necessary to prove any element of Plaintiffs' claim. "In the Third Circuit, a § 2 Sherman Act claim has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Op. Mot. Dismiss (Doc. No. 106), at 17 (quoting *LePage's*, 324 F.3d at 149). Additionally, analyzing Plaintiffs' claim under Section 1 of the Sherman Act requires three steps:

> First, the plaintiff must show that the challenged conduct has produced anti-competitive effects within the market. If the plaintiff meets the initial burden, the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective. Finally, the plaintiff can rebut the defendant's purported pro-competitive justification by showing that the restraint is not reasonably necessary to achieve the pro-competitive objective.

Op. Mot. Dismiss (Doc. No. 106), at 21 (quoting *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 209 (3d Cir. 2012)).

Proving or disproving that single allegation by Plaintiffs will have no bearing on the ultimate issue of whether Sanofi violated the antitrust laws. Plaintiffs allege that Sanofi maintained and enhanced monopoly power by illegally bundling its products, impairing competition, and raising prices to supracompetitive levels. Whether Plaintiffs make profits on sales of these vaccines is irrelevant to any of those issues. In this letter, Sanofi offers three vague, unsupported responses: namely, (1) that profit information "is relevant to the demand for pediatric vaccines"; (2) that "if there is no connection between costs and plaintiffs' profits and ability to compete, the information would rebut the 'anticompetitive effects' picture that plaintiffs are trying to paint"; and (3) "to the extent there *is* a connection [between costs and plaintiffs' profits], the information would be relevant to Sanofi's Counterclaim, as it goes to whether PBGs have the power to effectively enforce their cartels against cheating members." *Supra* at 41.

But these justifications are vague, and Sanofi never says, for example, how profit information will show demand (beyond what Sanofi can already tell from its own information about demand) or how demand is relevant to whether Sanofi is illegally bundling its products. Indeed, proving or disproving Plaintiffs' allegation will have no bearing on Plaintiffs' proof of injury or damages. Here, Plaintiffs seek to recover monetary damages to compensate for overcharges paid on purchases of meningococcal vaccine from Sanofi at artificially-inflated prices due to Sanofi's illegal maintenance and enhancement of monopoly power. Plaintiffs are not seeking damages in the form of lost profits or other injuries to business not related to the overcharges. *See, e.g.*, Compl., at 1(Preamble) & 41 (Prayer For Relief); *see also id.* ¶¶ 157, 163. It is well-established that *in overcharge cases such as this, information regarding whether Plaintiffs profited or lost as a result of the challenged conduct ("downstream discovery") is not relevant or discoverable*. For example, in denying downstream discovery for purposes of class certification in a similar bundling case, Judge Linares held that "direct

44

**Proskauer»**

purchasers that have suffered overcharges have an antitrust injury and would be entitled to
recover the full amount of the overcharge they paid; it is irrelevant if they may have also
benefitted from the higher prices because their profits were a percentage of their acquisition
costs." *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, No. 05-CV-1602, 2006 WL
6907107, at *6 (D.N.J. Sept. 7, 2006) (citing, *inter alia*, *Hanover Shoe v. United Shoe Mach.
Corp.*, 392 U.S. 481, 489 (1968)).[42]

The cases cited by Sanofi do not say otherwise. For example, in *Air Tech Equipment,
Ltd. v. Humidity Ventilation Sys., Inc.*, No. 05-CV-77, 2006 WL 3193720 (E.D.N.Y. Nov. 2,
2006), the court found that defendants had opened the door to discovery on their antitrust
counterclaim, not because of a background allegation in the complaint, but because they
specifically made a claim for injury to their business. *Id.* at * 2. Indeed, the court acknowledged
that courts generally proscribe such discovery in overcharge cases (typically price-fixing cases).
*Id.* at *1. Further, *In re Urethane Antitrust Litig.*, 237 F.R.D. 454 (D. Kan. 2006), does not hold
that "downstream" discovery is generally relevant; in fact, it notes that the cases generally hold
"that discovery of downstream data is not relevant to proving or disproving an underlying claim
of antitrust violations." *Id.* at 463. Instead, the court in *Urethane* held that the information was
relevant to certain specific class certification issues, and defendants have not asserted any such
issues, and Judge Linares has previously rejected such arguments in a prior similar bundling
case. *See supra* (quoting and discussing *Hypodermic Prod.*, 2006 WL 6907107, at *6).

Finally, contrary to Sanofi's assertion, the discovery is not relevant to the Counterclaim.
Sanofi never says how learning Plaintiffs' profitability (or lack thereof) on the vaccinations they
provide to patients will help Sanofi show that these physicians were able to enforce the alleged
buyer's conspiracy. While Sanofi says that the ability to terminate a customer's right to purchase
at the price under the PBG contract—a price Sanofi claims is discounted—can be an effective
means of enforcing the alleged cartel agreement orchestrated by Sanofi's PBGs, Sanofi never
explains why discovery Plaintiffs' profitability information is relevant to that. Sanofi obviously

---

[42] *See also, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 06–MD–1775, 2010 WL
4916723, at *2 (E.D.N.Y. Nov. 24, 2010) (noting "the tide of cases precluding discovery of
'downstream' information"); *In re K-Dur Antitrust Litig.*, No. 01-CV-1652, 2007 WL 5302308,
at *10-15 (D.N.J. Jan. 2, 2007), *aff'd in part on appeal* at 686 F.3d 197 (3d Cir. 2012); *In re
Automotive Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2006 WL 1479819 at *8 (E.D.Pa.
May 26, 2006) (direct purchaser rule of Illinois Brick was meant to "avoid the fishing
expeditions that result when downstream discovery was permitted" and noting "long-held
practice of proscribing discovery of downstream data and financial information"); *In re Pressure
Sensitive Labelstock Antitrust Litig.*, 226 F.R.D. 492, 498 (M.D. Pa. 2005) ("[C]ourts generally
proscribe downstream discovery . . . . [T]he Supreme Court has cautioned that the effectiveness
of antitrust actions may be substantially reduced if defendants are allowed to pursue an inquiry
into downstream activities and the massive discovery that such an inquiry would entail.").

**Proskauer**

will know whether the prices through the PBG contracts are lower than other Sanofi's list prices. In short, profitability information is in no way relevant to the Counterclaim.

In short, beyond the facile argument that Plaintiffs' mere allegation that Plaintiffs would be at a competitive disadvantage if they paid penalty prices "opened the door" to downstream discovery, Sanofi has made no legitimate attempt to tie this discovery to any "claim or defense at issue" in this case, and thus, Sanofi's request for this discovery should be rejected.

Dated:  November 2, 2012            Respectfully submitted,

/s/ Ryan P. Blaney
Ryan P. Blaney
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
T: (202) 416-5844
F: (202) 416-6900
E: rblaneyy@proskauer.com

*Attorney for Defendant-Counterclaim*
*Plaintiff Sanofi Pasteur Inc.*

/s/ Peter S. Pearlman
Peter S. Pearlman
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF, LLP
Park 80 Plaza West-One
250 Pehle Ave., Suite 401
Saddle Brook, NJ 07663
T: 201-845-9600
F: 201-845-9423
E: psp@njlawfirm.com

*Attorney for Plaintiffs-Counterclaim*
*Defendants*